## UNITED STATES *v.* LABONTE ET AL.

No. 95–1726.   Argued January 7, 1997—Decided May 27, 1997

*Deputy Solicitor General Dreeben* argued the cause for the United States. With him on the briefs were *Acting Solicitor General Dellinger, Acting Assistant Attorney General Keeney, Malcolm L. Stewart,* and *J. Douglas Wilson.*

*David N. Yellen* argued the cause for respondents. With him on the brief were *John A. Ciraldo,* by appointment of the Court, 518 U. S. 1037, *Peter Goldberger,* by appointment of the Court, 518 U. S. 1037, and *Michael C. Bourbeau,* by appointment of the Court, 518 U. S. 1037.*

JUSTICE THOMAS delivered the opinion of the Court.

In 28 U. S. C. § 994(h), Congress directed the United States Sentencing Commission (Commission) to "assure" that the Sentencing Guidelines specify a prison sentence "at or near the maximum term authorized for categories of" adult offenders who commit their third felony drug offense or violent crime. We are asked to decide whether, by "maximum term authorized," Congress meant (1) the maximum term available for the offense of conviction including any applicable

---

*David Duncan, Lisa B. Kemler,* and *David M. Zlotnick* filed a brief for the National Association of Criminal Defense Lawyers et al. as *amici curiae* urging affirmance.

statutory sentencing enhancements, as the United States argues, or (2) the maximum term available without such enhancements, as the Commission has determined. We conclude that the Commission's interpretation is inconsistent with § 994(h)'s plain language, and therefore hold that "maximum term authorized" must be read to include all applicable statutory sentencing enhancements.

# I

## A

In 1984, Congress created the Commission and charged it with "establish[ing] sentencing policies and practices for the Federal criminal justice system." 28 U. S. C. § 991; see *Mistretta* v. *United States*, 488 U. S. 361, 367–370 (1989). The Commission, however, was not granted unbounded discretion. Instead, Congress articulated general goals for federal sentencing and imposed upon the Commission a variety of specific requirements. See §§ 994(b)–(n). Among those requirements, Congress directed that the Commission

> "shall assure that the guidelines specify a sentence to a term of imprisonment at or near the maximum term authorized for categories of defendants in which the defendant is eighteen years old or older and—
> "(1) has been convicted of a felony that is—
> "(A) a crime of violence; or
> "(B) an offense described in section 401 of the Controlled Substances Act (21 U. S. C. 841) . . . ; and
> "(2) has previously been convicted of two or more prior [such] felonies . . . ." 28 U. S. C. § 994(h).

The Commission sought to implement this directive by promulgating the "Career Offender Guideline," which created a table of enhanced total offense levels to be used in calculating sentences for "career offenders." United States Sentencing Commission, Guidelines Manual § 4B1.1 (Nov. 1987)

(USSG). Pursuant to that Guideline, each defendant who qualifies for career offender status is automatically placed in criminal history "Category VI," the highest available under the Guidelines. The table then assigns the appropriate offense level based on the so-called "offense statutory maximum."

When the Commission coined the phrase "offense statutory maximum," it defined it, unhelpfully, as "the maximum term of imprisonment authorized for the offense of conviction." USSG App. C, amdt. 267 (Nov. 1989) (adding § 4B1.1, comment., n. 2). Neither the Career Offender Guideline itself, however, nor the accompanying commentary designated which "maximum term" was to be used when federal law established a basic statutory maximum for persons convicted of a particular offense, but also provided an enhanced maximum penalty for career offenders convicted of that same offense.[1] The Courts of Appeals, required to choose between sentencing "at or near the maximum" of the base sentence, or of the base sentence plus the relevant statutory enhancements, uniformly concluded that the "offense statutory maximum" for a defendant with prior convictions was the enhanced maximum term.[2]

The Commission subsequently amended the Career Offender Guideline's commentary to preclude consideration of statutory enhancements in calculating the "offense statutory maximum." Rejecting the approach prevailing in the

---

[1] We note that imposition of an enhanced penalty is not automatic. Such a penalty may not be imposed unless the Government files an information notifying the defendant in advance of trial (or prior to the acceptance of a plea) that it will rely on that defendant's prior convictions to seek a penalty enhancement. 21 U. S. C. § 851(a)(1). If the Government does not file such notice, however, the lower sentencing range will be applied even though the defendant may otherwise be eligible for the increased penalty.

[2] See United States v. Smith, 984 F. 2d 1084, 1087 (CA10), cert. denied, 510 U. S. 873 (1993); United States v. Garrett, 959 F. 2d 1005, 1009–1011 (CADC 1992); United States v. Amis, 926 F. 2d 328, 329–330 (CA3 1991); United States v. Sanchez-Lopez, 879 F. 2d 541, 558–560 (CA9 1989).

Courts of Appeals, the Commission defined the phrase "offense statutory maximum" as:

> "the maximum term of imprisonment authorized for the offense of conviction that is a crime of violence or controlled substance offense, not including any increase in that maximum term under a sentencing enhancement provision that applies because of the defendant's prior criminal record . . . ." USSG App. C, amdt. 506 (Nov. 1994) (amending USSG § 4B1.1, comment., n. 2).

Pursuant to its authority under 28 U. S. C. § 994(u), the Commission opted to give Amendment 506 retroactive effect, providing sentencing courts with discretion to reduce sentences imposed before the amendment's November 1, 1994, effective date. See USSG § 1B1.10(c) (Nov. 1996).

B

Prior to the adoption of Amendment 506, respondents George LaBonte, Alfred Lawrence Hunnewell, and Stephen Dyer were convicted of various federal controlled substance offenses in the United States District Court for the District of Maine. Each respondent qualified as a career offender under USSG § 4B1.1 (Nov. 1987), had received the required notice that an enhanced penalty would be sought, and was sentenced under the Career Offender Guideline using the enhancement. The First Circuit affirmed each respondent's conviction and sentence. Following the adoption of Amendment 506, however, each respondent sought a reduction in his sentence. In the cases of respondents Dyer and Hunnewell, the District Court found that the amendment was contrary to 21 U. S. C. § 841(b)(1)(C) and 28 U. S. C. § 994(h), and refused to reduce the sentences. In respondent LaBonte's case, however, a different judge of the same District Court upheld the amendment and reduced LaBonte's sentence. The First Circuit consolidated the ensuing appeals and a divided panel, applying the approach set forth in *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*,

467 U. S. 837 (1984), upheld Amendment 506 as an appropriate exercise of the Commission's discretion. 70 F. 3d 1396, 1403–1409 (1995). The First Circuit looked to the statutory language and "f[ou]nd no clear congressional directive regarding the meaning of the term 'maximum' as that term is used in section 994(h)." *Id.*, at 1406. In the court's view, the meaning of the word "maximum" was influenced by its presence in the phrase " 'maximum term authorized for [certain] categories of defendants.' " *Id.*, at 1404 (bracketed term in original). While acknowledging that the phrase could apply exclusively to that category of repeat offenders for whom the Government filed a notice to seek sentence enhancement, the court also observed that the word "categories" could plausibly be defined "to include *all* offenders (or all repeat offenders) charged with transgressing the same criminal statute, regardless of whether the prosecution chooses to invoke the sentence-enhancing mechanism against a particular defendant." *Id.*, at 1404–1405 (emphasis added). Under the latter view, the court reasoned, the word "maximum" would necessarily refer to the *unenhanced* statutory maximum "since this represents the highest possible sentence applicable to all defendants in the category." *Id.*, at 1405.

Based on that perceived ambiguity, the court explained that the "Career Offender Guideline, read through the prism of Amendment 506, adopts an entirely plausible version of the categorical approach that the statute suggests." *Id.*, at 1407. The court thus held that the Career Offender Guideline, as construed under Amendment 506, was a reasonable implementation of § 994(h)'s command to designate sentences at or near the authorized maximum term. *Id.*, at 1409.

In validating Amendment 506, the First Circuit here reached the same conclusion as the Ninth Circuit later did in *United States* v. *Dunn,* 80 F. 3d 402, 404 (1996). Five other Courts of Appeals, however, have reached the opposite conclusion, finding Amendment 506 at odds with the plain lan-

guage of § 994(h).[3]   We granted certiorari to resolve this conflict, 518 U. S. 1016 (1996), and now reverse.

## II

Congress has delegated to the Commission "significant discretion in formulating guidelines" for sentencing convicted federal offenders.   *Mistretta*, 488 U. S., at 377.   Broad as that discretion may be, however, it must bow to the specific directives of Congress.   In determining whether Amendment 506 accurately reflects Congress' intent, we turn, as we must, to the statutory language.   If the Commission's revised commentary is at odds with § 994(h)'s plain language, it must give way.   Cf. *Stinson* v. *United States*, 508 U. S. 36, 38 (1993) (explaining that the Guidelines commentary "is authoritative unless it violates the Constitution or a federal statute").

In § 994(h), Congress directed the Commission to "assure" that for adult offenders who commit their third felony drug offense or crime of violence, the Guidelines prescribe a sentence of imprisonment "at or near the maximum term authorized."   28 U. S. C. § 994(h).   We do not start from the premise that this language is imprecise.   Instead, we assume that in drafting this legislation, Congress said what it meant.   Giving the words used their "ordinary meaning," *Moskal* v. *United States*, 498 U. S. 103, 108 (1990), we find that the word "maximum" most naturally connotes the "greatest quantity or value attainable in a given case." Webster's New International Dictionary 1396 (2d ed. 1958); Black's Law Dictionary 979 (6th ed. 1990) ("The highest or greatest amount, quality, value, or degree").   We similarly

---

[3] See *United States* v. *McQuilkin*, 97 F. 3d 723, 731–733 (CA3 1996), cert. pending, No. 96–6810; *United States* v. *Branham*, 97 F. 3d 835, 845–846 (CA6 1996); *United States* v. *Hernandez*, 79 F. 3d 584, 595–601 (CA7 1996), cert. pending, Nos. 95–8469, 95–9335; *United States* v. *Fountain*, 83 F. 3d 946, 950–953 (CA8 1996), cert. pending, No. 96–6001; *United States* v. *Novey*, 78 F. 3d 1483, 1486–1488 (CA10 1996), cert. pending, No. 95–8791.

conclude, and the parties do not dispute, that the phrase "term authorized" refers not to the period of incarceration specified by the Guidelines, but to that permitted by the applicable sentencing statutes.[4] Accordingly, the phrase "maximum term authorized" should be construed as requiring the "highest" or "greatest" sentence allowed by statute.

Respondents, however, argue that "maximum term authorized" refers only to the highest penalty authorized by the offense of conviction, excluding any statutory sentencing enhancements. We find little merit in that contention. In calculating the "highest" term prescribed for a specific offense, it is not sufficient merely to identify the basic penalty associated with that offense. Congress has expressly provided enhanced maximum penalties for certain categories of repeat offenders in an effort to treat them more harshly than other offenders. Section 994(h) explicitly refers, for example, to 21 U. S. C. § 841, which establishes a base "term of imprisonment of not more than 20 years" for certain drug traffickers, but then adds that "[i]f any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term

---

[4] Indeed, the Commission has explicitly recognized that "the phrase 'maximum term authorized' should be construed as the maximum term authorized by *statute*." USSG § 4B1.1, comment., backg'd (Nov. 1987) (emphasis added). And, in our view, the phrase refers to all applicable statutes that would affect the district court's calculation of the prison term. Contrary to the dissent's suggestion, however, 18 U. S. C. § 3584 does not affect the maximum *term* authorized. Section 3584 merely instructs a sentencing court whether to run "multiple *terms* of imprisonment" consecutively or concurrently; it says nothing about how the individual term is to be calculated. § 3584 (emphasis added). Of course, § 3584(c), which the dissent highlights, *post*, at 770, directs that "[m]ultiple terms of imprisonment . . . shall be treated for *administrative purposes* as a single, aggregate term of imprisonment." 18 U. S. C. § 3584(c) (emphasis added). Each of the sections cited by the dissent falls within this "administrative purposes" carve-out, which in no way undercuts, and in fact plainly bolsters, our point.

of imprisonment of not more than 30 years." § 841(b)(1)(C). Where Congress has enacted a base penalty for first-time offenders or nonqualifying repeat offenders, and an enhanced penalty for qualifying repeat offenders, the "maximum term authorized" for the qualifying repeat offenders is the enhanced, not the base, term. As a consequence, the "maximum term authorized" for repeat offenders convicted under § 841(b)(1)(C) is 30 years—the enhanced statutory maximum—not the unenhanced maximum of 20 years.

Respondents' assertion that § 994(h) is ambiguous is based, at least in part, on a strained construction of the phrase "categories of defendants." They claim that the word "categories" can be defined broadly to encompass all repeat offenders charged with violating the same criminal statute—including those for whom the Government did not file a notice under § 851(a)(1) and who are therefore ineligible for the penalty enhancement. See n. 1, *supra*. If "categories of defendants" is defined in this way, respondents argue, a sentence "at or near the maximum term authorized" for this broader "category" of repeat offenders would necessarily permit only the unenhanced maximum because this is the highest possible sentence that could apply to all of the defendants within that category.

We see at least two serious flaws in this reasoning. First, respondents' construction of the word "categories" is overinclusive because it subsumes within a single category both defendants who have received notice under § 851(a)(1) and those who have not. The statutory scheme, however, obviously contemplates two distinct categories of repeat offenders for each possible crime. The Commission is no more free to ignore this distinction than it is to ignore the distinction made between those defendants who distributed certain controlled substances and those whose distribution also directly resulted in the death of a user. See, *e. g.*, 21 U. S. C. § 841(b)(1)(C). Thus, for defendants who have received the

notice under § 851(a)(1), as respondents did here, the "maximum term authorized" is the enhanced term. For defendants who did not receive the notice, the unenhanced maximum applies.

Second, to read the phrase "categories of defendants" as respondents suggest would largely eviscerate the penalty enhancements Congress enacted in statutes such as § 841. We are unwilling to read § 994(h) as essentially rendering meaningless entire provisions of other statutes to which it expressly refers. Under respondents' novel construction, a repeat drug or violent felon could only receive a sentence at or near the maximum allowed for defendants who had no such prior qualifying convictions or who had never received the notice under § 851(a)(1). Indeed, if this interpretation of the term "categories" were adopted, a sentencing court could be *forbidden* to impose the enhanced maximum penalty. Congress surely did not establish enhanced penalties for repeat offenders only to have the Commission render them a virtual nullity.

Respondents further seek to circumvent § 994(h)'s plain meaning by claiming that Amendment 506 satisfies Congress' mandate to sentence repeat offenders "at or near" the maximum sentence authorized. The flexibility afforded by the phrase "at or near," respondents contend, justifies the Commission's decision to rely on the unenhanced maximum. This statutory phrase unquestionably permits a certain degree of flexibility for upward and downward departures and adjustments. The pertinent issue, however, "is not how close the sentence must be to the statutory maximum, but to which statutory maximum it must be close." *United States* v. *Fountain*, 83 F. 3d 946, 952 (CA8 1996), cert. pending, No. 96–6001. Whatever latitude § 994(h) affords the Commission in deciding how close a sentence must come to the maximum to be "near" it, the statute does not license the Commission to select as the relevant "maximum term" a sen-

tence that is different from the congressionally authorized maximum term.[5]

Finally, respondents rely heavily on the Commission's stated justifications for choosing the unenhanced maximum. We are unmoved. First, the Commission asserted that, by precluding the use of the statutory enhancements, Amendment 506 "avoids unwarranted double counting" of the defendant's prior offenses. 59 Fed. Reg. 23608, 23609 (1994). That argument is entirely beside the point. Congress has instructed the Commission to assure that the sentences of repeat offenders closely track the statutory maximum. The number of steps the Commission employs to achieve that requirement is unimportant, provided the Commission's mechanism results in sentences "at or near" the "maximum term authorized."

Second, respondents invoke the Commission's assertion that its amended commentary eliminates "unwarranted disparity associated with variations in the exercise of prosecutional discretion in seeking enhanced penalties based on prior convictions." *Ibid.* As we understand it, this argument posits that if the Government provides notice under § 851(a)(1) to one defendant, but not to another, the resulting

---

[5] Respondents' reliance on *United States* v. *R. L. C.,* 503 U. S. 291 (1992), is inapposite. There, we construed 18 U. S. C. § 5037(c), which provides that the sentence ordered by a court for a juvenile delinquent may not extend beyond "the maximum term of imprisonment that would be authorized if the juvenile had been tried and convicted as an adult." We held that the applicable "maximum" term authorized was the upper limit of the Guidelines range that would apply to a similarly situated adult offender. 503 U. S., at 306–307. *R. L. C.* involved a directive to a sentencing court, however, whereas 28 U. S. C. § 994(h) is a directive to the Commission. Because § 994(h) is designed to cabin the Commission's discretion in the promulgation of guidelines for career offenders, it would be entirely circular to suggest that the Commission had complied with § 994(h) merely by specifying sentences "at or near" the top of the *Guidelines* range. The Commission itself recognizes that the "maximum term authorized" within the meaning of § 994(h) is the *statutory* maximum, not the otherwise applicable Guidelines maximum. See n. 4, *supra.*

difference in the maximum possible term is an "unwarranted disparity." Insofar as prosecutors, as a practical matter, may be able to determine whether a particular defendant will be subject to the enhanced statutory maximum, any such discretion would be similar to the discretion a prosecutor exercises when he decides what, if any, charges to bring against a criminal suspect. Such discretion is an integral feature of the criminal justice system, and is appropriate, so long as it is not based upon improper factors. See *United States* v. *Armstrong*, 517 U. S. 456, 464–465 (1996); *Wayte* v. *United States*, 470 U. S. 598, 607 (1985). Any disparity in the maximum statutory penalties between defendants who do and those who do not receive the notice is a foreseeable—but hardly improper—consequence of the statutory notice requirement.[6]

## III

In sum, we hold that the phrase "at or near the maximum term authorized" is unambiguous and requires a court to sentence a career offender "at or near" the "maximum" prison term available once all relevant statutory sentencing enhancements are taken into account. Accordingly, we reverse the judgment below and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BREYER, with whom JUSTICE STEVENS and JUSTICE GINSBURG join, dissenting.

The United States Sentencing Commission has interpreted three statutory words—the words "maximum term authorized"—to mean "maximum term of imprisonment authorized for the offense of conviction . . . not including . . . sentencing enhancement provision[s]" for recidivists. 28 U. S. C.

---

[6] Inasmuch as we find the statute at issue here unambiguous, we need not decide whether the Commission is owed deference under *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984).

§ 994(h); United States Sentencing Commission, Guidelines Manual § 4B1.1, comment., n. 2 (Nov. 1995) (USSG). The majority finds this interpretation unlawful. It believes that the three statutory words are unambiguous; that they are not susceptible to the Commission's interpretation; and that the only possible interpretation is one that does not except recidivist enhancement provisions.

In my view, however, the words "maximum term authorized" are ambiguous. They demand an answer to the question "authorized by *what?*" The statute itself does not tell us "what." Nor does the statute otherwise "directly [speak] to the precise [Guideline] question at issue." *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842 (1984); see *Smiley* v. *Citibank (South Dakota), N. A.*, 517 U. S. 735 (1996). In light of the statutory ambiguity, we should defer to the Commission's views about what Guideline the statute permits it to write; and we should uphold the Guideline the Commission has written because it "is based on a permissible construction of the statute." *Chevron, supra,* at 843.

## I

### A

To understand the legal issue before us, one must keep in mind both what the Guidelines are and how they work. The Guidelines themselves are a set of legal rules written by the United States Sentencing Commission acting under authority delegated to it by a congressional statute, the Sentencing Reform Act of 1984 (Sentencing Act), Pub. L. 98–473, § 217, 98 Stat. 2017– 2026, as amended, 28 U. S. C. §§ 991–998. See generally *Mistretta* v. *United States*, 488 U. S. 361 (1989). Congress established the United States Sentencing Commission both to create a more honest sentencing system (through the elimination of parole, see Pub. L. 98–473, § 218(a)(5), 98 Stat. 2027) and to create a fairer system by reducing the "unjustifiably wide range of sentences [pre-

viously imposed upon] offenders with similar histories, con-
victed of similar crimes, committed under similar circum-
stances," under the pre-existing indeterminate system of
sentencing. S. Rep. No. 98–225, p. 38 (1983). See also *Mis-
tretta, supra,* at 366.

At the same time, Congress said that the Commission,
when reducing disparity, should not "sacrific[e] proportional-
ity"—the principle that criminal conduct of greater severity
should be punished more harshly than less serious conduct.
United States Sentencing Commission, Supplementary Re-
port on the Initial Sentencing Guidelines and Policy State-
ments 13 (June 1987) (Supplementary Report). See also 18
U. S. C. § 3553(a)(2)(A) (sentences should "reflect the serious-
ness of the offense" and "provide just punishment"); 28
U. S. C. §§ 994(a)(2) and (g). This effort to achieve propor-
tionality required the Commission to identify those factors
that make criminal conduct more or less serious and provide
a way for those factors to be taken into account in the Guide-
lines. Yet because the list of relevant sentencing factors is
long, and their interaction impossibly complex, the Commis-
sion had to strike a compromise between the need for propor-
tionality on the one hand and the need for Guidelines that
were simple enough to be administered. USSG ch. 1, pt. A3,
p. s. The upshot is a Guidelines system that balances vari-
ous, sometimes conflicting, general goals, including reduction
of disparity, proportionality, and administrability.

The Guidelines divide sentencing factors into two basic
categories: "offense" characteristics and "offender" charac-
teristics. See generally USSG § 1B1.1. The Guidelines
first look to the characteristics of the "offense." The Guide-
lines tell a sentencing judge to consider the behavior in
which an offender engaged when he committed the crime of
which he was convicted. They assign a number—called a
"Base Offense Level"—to the behavior that constituted the
crime itself. (For example, they assign the Base Offense
Level 20 to robbery. *Id.,* § 2B3.1(a).) They next tell the

judge to look to the *way* in which the offender committed the crime; and they provide specific upward adjustments in light of certain aggravating features of the criminal behavior—adjustments they call "Specific Offense Characteristics." (For example, if the robber used a gun, the judge adds six levels. *Id.*, § 2B3.1(b)(2)(B).)

The Guidelines then tell the judge to turn to the relevant characteristics of the defendant, see 28 U. S. C. § 994(d)—features not of the crime, but of the criminal. In particular, they tell the judge to assign a number of "points" determined by what the Commission has determined to be the single most important offender characteristic, namely, the offender's prior criminal behavior. These points in turn correspond to one of six Criminal History Categories. (For example, if the robber had one serious prior criminal conviction, that is, one that led to a sentence of imprisonment of more than 13 months, the judge will assign three points, which places the offender in Criminal History Category II. USSG § 4A1.1(a), and *id.*, ch. 5, pt. A (table).)

After determining the "offense level" and Criminal History Category applicable to the offender, the sentencing judge (after making various other possible adjustments) will consult a table, the rows of which consist of "levels" and the columns of which consist of "Categories." The intersection of the appropriate row and column will normally indicate a narrow range of months of imprisonment. (For example, at the intersection of level 26 and Category II lies a sentencing range of 70–87 months' imprisonment. *Id.*, ch. 5, pt. A (table).) In an ordinary case, the judge will sentence within that indicated range.

I say "in an ordinary case" because almost all Guideline rules are meant to govern typical cases. See 18 U. S. C. § 3553(b); 28 U. S. C. §§ 991(b)(1)(B), 994(b)(2) (requiring strict limits upon judge's sentencing discretion in ordinary cases). At the same time, the sentencing judge is free to depart from the Guidelines sentence in an atypical case—one

outside the "heartland" of cases embodying the conduct that individual Guidelines describe. 18 U. S. C. § 3553(b); USSG ch. 1, pt. A4(b); *Koon* v. *United States,* 518 U. S. 81, 92–96 (1996). This "departure authority" is important because no set of Guidelines can anticipate every situation. Where "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines," a judge has the authority to impose an appropriate sentence, so long as that sentence is within the range authorized by the statute under which the defendant was convicted. See 18 U. S. C. § 3553(b); see also 28 U. S. C. § 991(b)(1)(B).

As the Commission has pointed out, this system reflects the Sentencing Act's "detailed instructions . . . the most important of which directs the Commission to create categories of *offense behavior* and *offender characteristics.*" USSG ch. 1, pt. A2 (emphasis added). See also 28 U. S. C. §§ 994(c) and (d). Twenty-five statutory subsections, §§ 994(a)–(y), contain these and other "detailed instructions"—instructions that both "delegat[e] broad authority to the Commission to . . . rationalize the federal sentencing process," USSG ch. 1, pt. A2, and also describe, at least in rough outline, how the Commission should go about exercising that authority. The case before us concerns 1 of those 25 subsections, 28 U. S. C. § 994(h), which I shall call the "career offender" subsection.

B

The "career offender" subsection provides more specific directions than most other subsections. It says that the Commission

> "shall assure that the guidelines specify a sentence to a term of imprisonment at or near the *maximum term authorized* for categories of defendants in which the defendant is eighteen years old or older and—
> "(1) has been convicted of a felony that is—
> "(A) a crime of violence; or

"(B) an offense described in section 401 of the Controlled Substances Act (21 U. S. C. 841) . . . ; and

"(2) has previously been convicted of two or more [similar] prior felonies . . . ." § 994(h) (emphasis added).

This provision, for present purposes, is not quite as complicated as it appears, for the words that follow the italicized words *"maximum term authorized"* do *not* modify or explain those italicized words. Rather, they describe the kind of person whom the Commission must make certain is sentenced to a term "at or near the maximum term authorized." It is as if the statute said to the Commission: Focus upon "categories" of individuals who have previously committed two serious crimes (involving drugs or violence) and make certain that the Guidelines specify, for those "categories" of individuals, "a sentence to a term of imprisonment at or near the maximum term authorized."

The Commission has recently rewritten the Guideline so that it now imposes sentences based upon

"the maximum term of imprisonment authorized for the offense of conviction . . . not including any increase in that maximum term under a sentencing enhancement provision that applies because of the defendant's prior criminal record." USSG § 4B1.1, comment., n. 2.

To understand how the new Guideline works, consider an example: The basic drug distribution statute, 21 U. S. C. § 841, has two relevant subsections, (a) and (b). Subsection (a) makes it a crime to "possess" a "controlled substance," such as cocaine, with "intent to distribute" it. Subsection (b) sets forth penalties—both minimum and maximum penalties—for violating subsection (a). Those penalties depend primarily upon the amount of drugs at issue, but also upon recidivism. One part of subsection (b), namely, subsection (b)(1)(B), for example, specifies a minimum penalty of 5 years and a maximum penalty of 40 years where the amount of cocaine ranges from 500 grams to 5 kilograms. A later por-

tion of that part increases the minimum penalty to 10 years and the maximum penalty to life if the offender has a previous drug felony conviction. The Commission's Career Offender Guideline treats the statutory term "authorized" as if it referred to the "maximums" that § 841 provides, *except for this last-mentioned part.*

## II

We must decide whether the career offender statute permits the Commission to write this Career Offender Guideline—a Guideline that looks to the maximum sentences that individual criminal statutes authorize for the *behavior* that constitutes the offense. That Guideline does not look to the maximum sentence that an individual criminal statute authorizes for recidivism—perhaps the most important *offender* characteristic. In a sense, it says that the career offender statute, which tells the Commission to transform statutory maximums into approximate Guideline minimums, *is* Congress' basic recidivism provision. That is to say, the Commission's Guideline essentially reads the career offender statute as permitting an implementing Guideline that substitutes for, rather than supplements, other statutory recidivism-based maximum-sentence enhancements.

The question that divides this Court is not about the wisdom of this implementing interpretation. It is whether the "career offender" statute's words "maximum term authorized" are *open* to the Commission's interpretation or whether they *unambiguously* forbid it. In my view, the words, whether read by themselves, read within the context of sentencing law, or read against the historic background of sentencing reform, do not unambiguously forbid the Guideline. Rather, their ambiguity indicates that Congress simply has not "addressed the precise question." *Chevron*, 467 U. S., at 843.

First, the language itself—the words "maximum term authorized"—is ambiguous. As I previously pointed out,

*supra,* at 767, the immediately subsequent words (about categories of offenders) do not explain the words "maximum term authorized," for they do not modify those words. Hence the question remains, "authorized by what?" All parties agree that the relevant maximum is the maximum set by sentencing statutes and not, for example, the top of the otherwise applicable Guideline range. But still, to *which* sentencing statutes does the phrase refer? The answer to this question is not written upon the statute's face.

The phrase could not possibly refer to every sentencing statute, nor to every statute that controls the length of the maximum legally possible sentence for a particular offender or kind of offender. It seems most unlikely that the phrase was intended to include, for example, 18 U. S. C. § 3565(a)(2)—a statute that authorizes a sentence for a probation violator up to the maximum initially available for the underlying crime. I have never heard anyone claim that an offender who commits his third drug crime while on probation for, say, a minor part in a counterfeiting offense, see § 471; USSG § 2B5.1, should receive a sentence that approximates the statutory maximum for the drug offense *plus* the 15-year counterfeiting statutory maximum added in addition. But see *ante,* at 757–758.

Nor, to take another example, could the phrase mean to include the federal statute that governs "[m]ultiple sentences of imprisonment," 18 U. S. C. § 3584—a statute that grants sentencing judges broad authority to "run" multiple sentences either "concurrently or consecutively." That statute would permit a judge to impose, say, a 20-year maximum sentence for each count of a six-count indictment and run those sentences consecutively, producing a total sentence of 120 years. Yet judges would not impose a sentence of 120 years upon an offender who engaged in a single related set of six 10-gram cocaine sales, even if each sale were the subject of a separate count in a prosecutor's indictment. (The Guidelines would not permit this 120-year imaginary sen-

tence. See USSG §§ 3D1.2(d), 3D1.3(b).) No one thinks that Congress intended the Commission to write its "career offender" Guideline with an eye toward the maximum sentences that this kind of statute (the "multiple sentences" statute) theoretically would authorize.

The majority, in providing a set of arguments for the correct conclusion that the phrase "maximum term authorized" does not include the statute just mentioned, effectively concedes this point. The majority cannot say that the terms of imprisonment authorized by this statute do not even *potentially* fall within the scope of the phrase "maximum term authorized," for the majority's interpretation of this statute—intended to avoid its application—is itself neither obvious nor even necessarily correct. (Compare the majority's use of the words "term of imprisonment," for example, see *ante*, at 758, n. 4, with the numerous instances in which sentencing law, including a portion of the "multiple sentence" statute itself, 18 U. S. C. § 3584(c), uses those words to refer to the actual time to be served as the result of a sentence imposed on a defendant. *E. g.*, §§ 3582, 3585, 3621, 3624.) And once one understands the need to engage in rather complex exercises in statutory interpretation to separate out, from the set of all potentially applicable sentencing statutes, those to which the word "authorized" refers, one understands that the referent of that word "authorized" is not *obvious*—and that is the main point here at issue.

Nor can one resolve the linguistic ambiguity by claiming (as the drafters of the relevant statutory language seem to have claimed, see *infra*, at 775) that Congress simply meant to refer to the maximum statutory penalties for the "offenses" of which offenders are convicted. That is because the word "offense" is a technical term in the criminal law, referring to a crime made up of statutorily defined "elements." See *Staples* v. *United States*, 511 U. S. 600, 604 (1994); *Liparota* v. *United States*, 471 U. S. 419, 424 (1985). Although some criminal statutes consider recidivism an ele-

ment of the offense, *e. g.*, 18 U. S. C. § 922(g) (felon in posses-
sion of a firearm), many other important criminal statutes
do not. Under the drug possession statute, for example,
recidivism is *not* an element of the offense, but, rather,
a sentencing-related circumstance that the prosecution need
not charge or prove at trial. Compare 21 U. S. C. § 841(a)
(defining the offense) with § 841(b) (setting penalties). Thus,
one might read the statute as referring to the maximum sen-
tences imposed for "offenses" technically defined (a reading
that would leave out most statutory recidivism enhance-
ments) or one might not. The language of the statute, even
if read as referring to offenses, does not say.

Second, background sentencing law does not provide an
unambiguous answer to the "authorized by what" question.
That background law includes a fundamental distinction
between "offense characteristics" and "offender charac-
teristics." This distinction underlies the Guidelines' basic
structure, see *supra*, at 764–766; it is embodied in the
Commission's authorizing statute, 28 U. S. C. §§ 994(c) and
(d); and it grows out of pre-Guideline sentencing law, see,
*e. g.*, *Woodson* v. *North Carolina*, 428 U. S. 280, 304 (1976)
(plurality opinion); *Pennsylvania ex rel. Sullivan* v. *Ashe*,
302 U. S. 51, 55 (1937). Thus, it is not surprising that the
Commission should write a Career Offender Guideline that
itself reflects that distinction; nor can one consider the dis-
tinction arbitrary, as if, for example, the Commission were
to have picked and chosen among different *offense* charac-
teristics. Cf. *ante*, at 759. To the contrary, this aspect of
background sentencing law makes plausible a reading that
sees this directive to create a generally applicable Career
Offender Guideline as, in a sense, a *substitute* for other, more
specific recidivism-based sentence enhancements already
scattered throughout the Federal Criminal Code. Of course,
one could also read the statute as a supplement to those pro-
visions. But the statute itself does not tell us which reading
is correct.

One further background circumstance helps to explain why the Commission's reading of the statute is not arbitrary, *i. e.*, why it is not unreasonable for the Guideline to treat recidivist enhancements differently from enhancements based on conduct. The career offender subsection was enacted in the context of a sweeping overhaul of the federal system of criminal sentencing brought about by the Sentencing Act. One objective of the Act was honesty in sentencing, the idea that an offender actually should serve approximately the time stated in the sentence that the judge imposed. S. Rep. No. 98–225, at 56. Congress achieved this objective by abolishing parole. It thereby transformed the sentence the judge pronounced from an enormous overstatement (given the fact that the offender would have spent perhaps one-third to one-half or even more of that time on parole), into *real-time* years almost all of which the offender would actually spend in prison. In other words, given parole, a 30-year sentence might mean 10 to 20 years; a 15-year sentence might mean 5. See generally *id.*, at 46–49; Supplementary Report, App. C.

When it abolished parole, however, Congress did not expect the Commission to write Guidelines that automatically transformed into "real time" the parole-inflated 20- or 30-year terms that judges had previously imposed upon, say, bank robbers or drug offenders. Rather Congress expected the Commission to adjust the length of the sentence the judge pronounced downward to reflect the fact that henceforth there would be no parole and the offender would really serve close to the entire term. See 28 U. S. C. § 994(m). That is what the Commission did. Supplementary Report 21.

This contextual circumstance helps to explain why Congress *might* indeed have expected that the Commission would read the career offender subsection to refer to statutory offenses plus conduct-based enhancements alone (without recidivism-based sentence enhancements). Congress realized that the pre-Guideline sentencing system would have

translated the words "20 years maximum" in, say, a drug statute into maximum sentences that approximated, say, 12 real-time years. Congress similarly realized that the pre-Guideline sentencing system would have translated the words "30 years maximum" in, say, a drug statute's recidivism provision, into maximum sentences that approximated, say, 20 real-time years. That is to say, Congress realized that, pre-Guidelines (because of parole), even the most serious class of recidivist offenders (in the absence of other aggravating *conduct*) would have likely been imprisoned for no more than 20 real-time years. Under these circumstances, a legislator could reasonably have taken the career offender statute's basic objective as one of assuring that all three-time recidivists serve the, say, 20 real-time years that only the worst of them would previously have served. That is to say, by mandating sentences at or near the (newly enacted) 20 year *non*recidivist maximum (for large quantities of cocaine), the career offender subsection would ensure that *all* career offenders serve terms at or near the real-time maximum that only the most serious offenders would have served under a pre-Guidelines (parole-based) system. And in this way as well, the career-offender provision would significantly increase the likely real-time sentences served by most three-time offenders.

To understand the impact of real-time sentencing thus helps explain why recidivist maximums are different from maximums associated with *offense* characteristics; it shows how the Commission's reading is consistent with Congress' obvious intent to increase recidivist sentences significantly; it shows how a general recidivist Guideline has an effect of a different kind than the statutory recidivist enhancements contained in prior law and hence might have been thought of as operating without reference to those enhancements; and it explains how legislators *might* reasonably have sought the goals implicit in the Commission's reading of the statute. Of course, it may also be the case that no legislator actually

considered the problem before us. Or Congress instead might have had quite different goals in mind. As the majority says, Congress *might* have intended the Commission to insist that all three-time career offenders serve a real-time sentence significantly longer that the worst of them would likely have served before the Guidelines. The important point for present purposes is that the statute itself does not tell us *which* of these alternative goals Congress sought to achieve. The basic objectives of the career offender subsection—ensuring increased penalties for recidivist offenders who have committed crimes involving drugs or violence—and of sentencing reform are consistent with either basic purpose and thus do not resolve the ambiguity.

Third, the statute's legislative history, insofar as it is relevant, helps to explain why any search for a clear expression of congressional intent is pointless. When first enacted into law, the career offender subsection did not leave the word "authorized" hanging in midair. Rather, it said "maximum term authorized *by section 3581(b) of title 18, United States Code.*" Pub. L. 98–473, 98 Stat. 2021 (emphasis added). The subsection to which the word "authorized" referred—a subsection that classified crimes by letter—read as follows:

> "Authorized Terms.—The authorized terms of imprisonment are—
>
> "(1) for a Class A felony, the duration of the defendant's life or any period of time;
>
> "(2) for a Class B felony, not more than twenty-five years;
>
> "(3) for a Class C felony, not more than twelve years;
>
> "(4) for a Class D felony, not more than six years;
>
> "(5) for a Class E felony, not more than three years;
>
> "(6) for a Class A misdemeanor, not more than one year;
>
> "(7) for a Class B misdemeanor, not more than six months;

"(8) for a Class C misdemeanor, not more than thirty days; and

"(9) for an infraction, not more than five days." 18 U. S. C. § 3581(b).

A cross-reference to this classifying subsection does not help, however, for that subsection serves almost no significant purpose in the Federal Criminal Code. In fact, Congress later enacted a technical amendment that eliminated the cross-reference (leaving the word "authorized" without an explicit reference), Pub. L. 99–646, 100 Stat. 3592, because the cross-reference was "misleading" and "incorrect" in that "[t]o date, no Federal offense" uses the classification system in the section to which it referred. H. R. Rep. No. 99–797, p. 18 (1986). The drafters of the technical amendment thought that the "maximum term of an offense is that term prescribed by the provision of law defining the offense." *Ibid.* But, as we have seen, this view of the matter is not conclusive. See *supra,* at 770–771.

One can find a possible historical explanation for what occurred. The classifying subsection, like the sentencing law itself, originated in a congressional effort to rewrite the entire Federal Criminal Code. See, *e. g.,* S. 1, 94th Cong., 1st Sess. (1975); S. 1437, 95th Cong., 2d Sess. (1978); S. 1630, 97th Cong., 2d Sess. (1981). That rewrite attached a classifying letter to each substantive crime. The classifying subsection attached a maximum penalty to each letter; and the penalty was a real-time penalty, for the rewrite contained the later enacted new sentencing law, which abolished parole and created real-time sentences. For example, the rewrite characterized its only drug recidivism provision—an enhanced penalty for a recidivist opiate crime—as a Class B felony; to which the classifying subsection attached a 25-year maximum sentence. See, *e. g.,* S. Rep. No. 95–605, pt. 1, pp. 798, 801 (1977). The rewrite did not become law. Congress, instead, enacted into law its sentencing provisions, which included a career offender statute that initially contained a

cross-reference to the classifying subsection that no longer served any significant purpose.

This history may help to explain why Congress did not directly provide a clear cross-reference in the career offender subsection. But it does not itself provide such a reference. A reader still might see in that subsection a predominating congressional focus upon increasing *all* career offenders' real-time terms to a typical real-time *maximum* term (in which case it is natural to read the subsection as omitting statutory recidivism provisions) or one might see in it a predominating congressional insistence upon further major increases in the real-time maximum terms themselves (in which case it is natural to read the subsection's cross-reference as picking up statutory recidivism provisions). The subsection's language, whether read by itself, read in a broader context of sentencing law, or read against the provision's history, is consistent with *either* interpretation.

Finally, the majority is wrong when it argues that the Career Offender Guideline "eviscerate[s] the penalty enhancements Congress enacted in statutes such as § 841." *Ante,* at 760. Section 841 increases maximum penalties for recidivists, for example, for crimes involving less than 500 grams of cocaine, from 20 years to 30 years. The Commission's career offender penalties for these offenses yield sentences "at or near" the "non-recidivist" maximum. This increased statutory maximum increases what would otherwise be a statutory cap on any sentence imposed, thereby permitting the sentencing judge to sentence a recidivist to more than the statute's first offender maximum (20 years for 30 grams). Consequently, the statutory increase authorizes a higher sentence when the relevant Guideline range reaches beyond that first offender maximum (as it does in the case of some of the ranges prescribed by the Career Offender Guideline). See, *e. g.,* USSG § 4B1.1 (table); *id.,* ch. 5, pt. A (table). It authorizes a higher sentence when the sentencing judge faces an atypical case warranting a departure upward. See 18

U. S. C. § 3553(b). And, most important, it authorizes a higher sentence should the Commission decide to write *other* Guidelines with specific offense characteristics that tell a judge to sentence certain especially dangerous recidivists (say, violent drug offenders) to more than the first offender maximums. See, *e. g.*, USSG § 2D1.1(a)(1).

The upshot is that the majority cannot find here, or anywhere else in sentencing law, a clear indication of what Congress *must have meant* by its open-ended term "authorized." The term is ambiguous.

## III

Although the Court does not "decide whether the Commission is owed deference under *Chevron*," *ante*, at 762, n. 6, I believe that it is. *Chevron* directs courts to defer to "an agency's construction of the statute which it administers," 467 U. S., at 842, when Congress, because it has not clearly addressed an issue in the statute itself, likely intends that the consequent

> "ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows. See *Chevron, supra*, at 843–844." *Smiley* v. *Citibank (South Dakota), N. A.*, 517 U. S., at 741.

This kind of inference makes sense in this case. Although the Commission is in the "judicial branch" of Government, 28 U. S. C. § 991(a); *Mistretta*, 488 U. S., at 384–397, Congress intended it to carry out a task similar to rulemaking tasks that Congress has often delegated to administrative agencies. The Commission's overall congressional mandate is sweeping. See 28 U. S. C. § 994(f) ("providing certainty and fairness in sentencing and reducing unwarranted sentence disparities"); § 991(b). Without broad delegated authority, it would not be possible to reconcile Congress' general objectives—of uniformity, proportionality, and administrability— nor to reconcile those general objectives with a host of more

specific statutory instructions. § 994. Thus the very nature of the task, along with the structure of the Sentencing Act, indicates a congressional intent to delegate primarily to the Commission the job of interpreting, and harmonizing, the authorizing Act's specific statutory instructions—subject, of course, to the kind of judicial supervision and review that courts would undertake were the Commission a typical administrative agency. This Court has previously implied that this is so. See *Stinson* v. *United States*, 508 U. S. 36, 44–45 (1993); cf. *Mistretta, supra*, at 393–394.

Were the Commission a typical administrative agency, we would ask whether its "policy" choice is "reasonable," hence "permissible," given the statute. *Chevron, supra*, at 843–844, 866. And we would give the Commission considerable interpretive leeway in light of the fact that the choice here at issue lies at the very heart of the Commission's policy-related "expertise." *Pension Benefit Guaranty Corporation* v. *LTV Corp.*, 496 U. S. 633, 651–652 (1990) ("[P]ractical agency expertise is one of the principal justifications behind *Chevron* deference"); *Commodity Futures Trading Comm'n* v. *Schor*, 478 U. S. 833, 845 (1986). The Commission's exercise of that expertise here—its Career Offender Guideline— meets this legal requirement.

As a matter of policy, the Commission could take account of the fact that the Guideline that the majority believes the statute requires would significantly interfere with one of the Sentencing Act's basic objectives—greater uniformity in sentencing. 28 U. S. C. §§ 991(b)(1)(B), 994(f). That is because at least one important set of statutory recidivist enhancements—the drug crime enhancements contained in 21 U. S. C. § 841(b)—may be imposed only when the prosecutor files a specific document requesting it. § 851(a). Consequently, the majority's interpretation of 28 U. S. C. § 994(h) places significant power in the hands of the prosecutor to determine the length of the offender's sentence; and different prosecutors at different times may exercise that power in

different ways. The Commission concluded that its interpretation avoids "unwarranted disparity associated with variations in the exercise of prosecut[orial] discretion," 59 Fed. Reg. 23608, 23609 (1994), in furtherance of the overriding congressional objective. 28 U. S. C. § 991(b)(1)(B).

The majority counters that "any such discretion would be similar to the discretion a prosecutor exercises when he decides what, if any, charges to bring against a criminal suspect." *Ante*, at 762. But this reply overlooks the fact that the Guidelines themselves, by basing punishments primarily upon the actual behavior that underlies an offense, are written to diminish the impact of such prosecutorial discretion. See USSG § 1B1.3. The Commission recognized that the problem is one of diminishing, rather than aggravating, sentencing disparity among similarly situated defendants. And the Commission's interpretation finds support in that basic objective.

As a matter of policy, the Commission was free to consider the practical impact of the competing interpretations—in terms both of their comparative effectiveness in furthering the basic goals of punishment (deterrence, incapacitation, just deserts, rehabilitation), 18 U. S. C. § 3553(a); 28 U. S. C. § 994(a)(2); USSG ch. 1, pt. A3, and their comparative costs in terms of real resources, 28 U. S. C. § 994(g). And it might have thought that its present interpretation better balanced these objectives.

Consider an example: The *ordinary* (non-Career Offender) Guideline sentence, applicable to a three-time offender, for possession with intent to distribute a single dose of cocaine is 18 months; for possession with intent to distribute 400 grams it is 6 years. The statutory first-offender maximum is 20 years. The recidivist maximum is 30 years. As a matter of policy, the Commission might have thought that an increase from 18 months (or 6 years) to 20 real-time years adequately served basic punishment objectives (as well as Congress' specific instruction to assure "substantial prison

terms" for repeat drug offenders, S. Rep. No. 98–225, at 175).
And, at the same time, it might have thought an increase to
30 real-time years would have added significantly to costs,
without significantly advancing any other punitive purpose.
See generally Supplementary Report 71, 73 (predicting
an 8%–10% increase in federal prison populations from 1987
to 2002 due solely to the effects of the career offender
subsection).

Finally, as a matter of policy, the Commission might have
believed the Guidelines would create a more coherent sen-
tencing system if its Career Offender Guideline basically re-
created recidivist real-time *maximums*, rather than increas-
ing those maximums by folding in the additional time that
previously had represented parole. *Supra*, at 772–774.

This discussion of policy may help to make clear one reason
why I find the majority's decision regrettable. The decision
interferes with a legitimate exercise of the Commission's au-
thority to write Guidelines that reconcile the various, some-
times competing, goals that Congress set forth. The United
States Criminal Code contains a highly complicated group of
statutes. Congress wrote many of them long before it
thought of creating sentencing Guidelines. Congress con-
tinues to write other statutes that the Commission, when
revising its Guidelines, may, or may not, find easy to recon-
cile with what has gone before. Congress understood that
the Commission's task is complex. Congress understood the
importance of the statute's general goals—a fairer and more
rational sentencing system. I believe that courts, when in-
terpreting the authorizing Act, should recall Congress' over-
riding objectives and Congress' understood need to grant to
this arm of the "judicial branch of the United States," 28
U. S. C. § 991(a), the discretionary authority necessary to
achieve them. I would allow the Commission to interpret
the ambiguous words of the statute before us with these
general congressional objectives in mind.

I would affirm the judgment of the Court of Appeals.