In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 12-1501 & 12-2382

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOSE ZUNO, JR. and ISMAEL ZUNO,

*Defendants-Appellants.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:10-cr-00444-1&2 — **Samuel Der-Yeghiayan**, *Judge.*

ARGUED FEBRUARY 11, 2013 — DECIDED SEPTEMBER 30, 2013

Before EASTERBROOK, *Chief Judge,* and POSNER and TINDER,
*Circuit Judges.*

TINDER, *Circuit Judge.* These consolidated criminal sentencing appeals are brought by two brothers, Jose and Ismael Zuno, who were involved in the distribution of cocaine and marijuana in the Addison, Illinois area from November 2008 until December 2009. In June 2010, their illicit activities resulted in federal criminal charges being filed against them.

The Zunos were charged with being members of a conspiracy to possess cocaine and marijuana with the intent to distribute it. *See* 21 U.S.C. § 846. Ismael also was charged in nineteen cocaine distribution counts. *See id.* § 841(a)(1). His younger brother, Jose, was charged in twenty-one additional counts: nineteen for cocaine distribution, *see id.*, and two for the use of a communication facility to commit a drug trafficking offense, *see id.* § 843(b). Both brothers had prior felony drug convictions, so the prosecution filed an information pursuant to 21 U.S.C. § 851 as to both, triggering for each of them the potential of a ten-year mandatory minimum term of incarceration. Ultimately, both Zunos pleaded guilty to the conspiracy count and Ismael also pleaded guilty to the nineteen distribution counts. Jose's plea was entered pursuant to a plea agreement which included provisions resulting in the dismissal of all of the other charges against him and the prior conviction information; he was sentenced to an 80-month term of incarceration. Ismael's guilty plea was entered without an agreement with the government, which is sometimes called a "blind" plea; he was sentenced to a prison term of 120 months.

In calculating the brothers' Sentencing Guideline offense levels at their respective sentencing hearings, the district judge determined that both brothers were organizers or leaders of a drug organization that involved five or more participants or was otherwise extensive pursuant to U.S.S.G. § 3B1.1(a), resulting in a four-level increase in their base offense levels. Both Zunos dispute that guideline determination on appeal. Ismael also challenges the drug quantity attributed to him and the mandatory minimum ten-year sentence he received because of the application of the § 851 prior drug conviction

enhancement. We will relate the facts relevant to these issues as they were developed in the district court and then discuss the sentencing challenges raised.

## I. BACKGROUND

The Federal Bureau of Investigation (FBI) began an undercover investigation of Ismael Zuno in April 2008. A law enforcement officer posed as a cocaine purchaser and from May 2008 until January 2009, purchased cocaine from Ismael about nineteen times, with two of those purchases also including marijuana. It appears that Jose began assisting Ismael with the operation around November 2008. As time went on, the investigation expanded to include Jose and affiliates of the Zunos. In the latter part of the investigation, a wiretap order for a cell phone used principally by Jose was issued and numerous phone conversations related to the Zuno drug trafficking were intercepted.

Twice in 2008, first in late November and then in early December, Jose delivered cocaine (approximately 55 grams on each occasion) that the undercover officer had ordered from Ismael. Apparently unbeknownst to the FBI, the Chicago Police Department (CPD) was interested in Ismael too, and on November 16, 2008, the CPD executed a state-court-issued search warrant for Ismael's residence. The search yielded approximately 125 grams of marijuana and a .357 magnum revolver. Ismael was charged in an Illinois court with the manufacture/delivery of a controlled substance and possession of drug paraphernalia and a firearm without having a Firearm Owner's Identification Card. He pleaded guilty to the manu-

facture/delivery charge and was sentenced to one year of imprisonment.

But that wasn't the only legal problem Ismael had besides the FBI investigation. He was also arrested in January 2009 for multiple counts of murder arising from a shooting (unrelated to the drug investigation) and was jailed pending trial in Cook County Circuit Court. Obviously, during that incarceration, Ismael's hands-on involvement in the drug distribution efforts was involuntarily limited, so Jose stepped up to direct the operation. Part of Jose's increased involvement began with a contact he made with the undercover officer who had been ordering cocaine from Ismael. Jose provided the officer with his cell phone number for the placement of future cocaine orders, thus leading to the wiretap. Subsequently, and continuing up until December 2009, the undercover officer placed orders directly with Jose on about sixteen occasions, and the deliveries were either made or arranged for by Jose, totaling about 1400 grams of cocaine.

During Ismael's incarceration, Jose continued to consult Ismael about their drug business. Two calls in early May 2009 exemplify that continuing involvement. On the first of May, Jose told Ismael about his concerns regarding a particular drug customer who had seen Jose's drug stash. The following day, Ismael was recorded asking Jose about another regular drug buyer, and Ismael criticized the prices that Jose was charging that customer. Later on, in November of that year, Jose reported to Ismael that a competing drug dealer had been stealing their customers so Jose had begun stealing that dealer's customers. Jose's plea agreement contained several relevant admissions, including that he and Ismael "were the

leaders of the Zuno Drug Trafficking Organization" and that during Ismael's incarceration, Jose "repeatedly consulted with Ismael … on their drug trafficking operation."

Ismael and Jose had help in the drug distribution from friends and family. Their brother-in-law, Juan Rochel, was their cocaine supplier. The Zunos often received the cocaine from him on credit, which enabled them to pay the cost of it after they had redistributed the multiple-ounce quantities to their various customers, a practice known as "fronting." From various intercepted telephone calls between Jose and Rochel, the investigators learned that Jose would allow Rochel to enter his house when he was away to make cocaine deliveries. Rochel would store the cocaine in a cereal box or pots in Jose's kitchen and then communicate the location to Jose. For example, to explain one such delivery, Rochel told Jose that he should "eat some cereal" when he returned to his residence. Similarly, when a certain quantity of cocaine Rochel had delivered was not moving, Rochel was able to ask for a return of the drugs so he could supply them to another outlet. Rochel was also aware that Ismael's girlfriend's residence was used for storage of the Zuno drugs.

Another Juan (Juan Zuno), a cousin of the brothers, assisted them by delivering and picking up cocaine at their direction. He also served as a driver for Ismael and later Jose when they were delivering drugs. One of the assignments included driving Ismael to deliver drugs to a customer who was, in fact, the undercover officer. On other occasions, Juan Zuno drove Jose to deliver cocaine to the undercover officer. On one specific occasion, Juan delivered about 250 grams of cocaine to the officer to fill an order placed with Jose.

Ismael's girlfriend (Individual D) allowed Jose to store drugs at her residence. On occasion, she delivered cocaine from her home to him. On November 6, 2009, a phone conversation between Individual D and Jose was intercepted. During the call, Jose told Individual D to retrieve a box under her bed and bring him the "little white bag." He explained that he did not like driving around with drugs (which he referred to as "shit") in his vehicle because he did not have a license. Her response was "Oh, just this little one?" Zuno also informed Individual D of certain important developments in the operation. For example, after Juan Zuno's delivery of the cocaine to the undercover officer, he was stopped by law enforcement agents who seized the buy money, $6,740, from him. Later that day, Jose called Individual D to inform her about the stop. During that intercepted conversation, Jose also told her that there were currently no drugs stored at her residence so she did not have to worry, even though he thought the DEA was following him around. Her response, "Oh shit," may have expressed her anxiety about the situation. When Jose mentioned to her that all of his buy money had been seized, her response was "Damn, damn, damn."

Later in the investigation, Individual D's home was searched pursuant to a warrant issued in connection with this case, and a couple of bags of cocaine (about 53 grams in total) and five bags of marijuana (totaling 351 grams) were seized from a safe in her home. The drugs had been stored there by Jose, a fact confirmed by the recovery of an impression of his fingerprints from the safe. Still later, Individual D was interviewed by the FBI and admitted that she allowed Jose to store cocaine and marijuana at her home, and that she knew he sold

marijuana and what she described as small amounts of cocaine. She also admitted to occasionally taking small bags of cocaine and marijuana to Jose on request, but she denied knowing that he would sell the drugs and claimed not to know the contents of the safe.

The intercepted telephone calls also disclosed that the Zunos serviced several cocaine buyers who would purchase quantities of cocaine every two weeks. One in particular, identified as Individual F, bought about 125 grams from Jose in mid-December 2009, in a purchase that was brokered by a person identified as Individual G. It appears that many of the sales made by the Zunos were also made on credit, to be funded by future sales in which the Zunos had an interest. For example, in one telephone conversation between Jose and Rochel discussing money that Jose owed Rochel for fronted drugs, Jose indicated that he could currently only repay $1,000 owed (which he referred to as "one") but that he would "pick up from … the little workers" and then would repay Rochel two thousand dollars, which he called "two dollars."

Ultimately, the district judge found Jose to be responsible for the drugs distributed during the conspiracy period: from November 2008 until December 2009. By contrast, he determined that Ismael was responsible for a larger amount: the drugs distributed to the undercover officer from May 2008 until early November of that year, plus the drugs distributed during the conspiracy period because, despite his incarceration, he "remained a member of the conspiracy … and … the drug quantities sold by Jose Zuno and stored by [Ismael's] girlfriend at her house were reasonably foreseeable to [him]."

**II. DISCUSSION**

We will first discuss the leader or organizer enhancement about which both Zunos complain and then turn to Ismael's individual objections to the mandatory minimum sentence he received and the drug quantity attributed to him. The Zunos contend that the district court erred in determining that their criminal activity involved five or more participants and in applying the four-level enhancement under U.S.S.G. § 3B1.1(a). They argue that a two-level adjustment under § 3B1.1(c) is appropriate instead. We review the district court's application of the guidelines de novo and review its factual determinations for clear error. *United States v. Walsh*, 723 F.3d 802, 807 (7th Cir. 2013). The Zunos do not dispute that they were organizers or leaders of the offense; they dispute only whether the conspiracy involved five or more participants and whether they exercised management or control over five participants.

"A 'participant' is someone 'who is criminally responsible for the commission of the offense, but need not have been convicted.'" *United States v. Blaylock*, 413 F.3d 616, 618 (7th Cir. 2005) (quoting U.S.S.G. § 3B1.1, cmt. n.1). "[T]his means that the person '*could have* been charged,' even if only as an accessory; but 'mere knowledge of a conspiracy' is insufficient to establish that a person was 'criminally responsible.'" *United States v. Fluker*, 698 F.3d 988, 1002 (7th Cir. 2012) (quoting *United States v. Pabey*, 664 F.3d 1084, 1097 (7th Cir. 2011)); *see also Blaylock*, 413 F.3d at 618 ("What matters is that [the person] knowingly aided some part of the criminal enterprise.").

The district court did not clearly err in finding that the conspiracy involved five or more participants: Jose, Ismael,

Juan Zuno, Juan Rochel, and Individual D. The defendants do not dispute that they and Juan Zuno were participants; rather, they challenge the inclusion of Rochel and Individual D. However, the evidence establishes that Rochel and Individual D were participants in the Zuno conspiracy. Rochel often fronted large quantities of cocaine to the Zunos on credit. The intercepted telephone calls between Jose and Rochel reveal that their drug relationship was more involved than Juan simply serving as a source of cocaine for the Zuno brothers. The high level of mutual trust evidenced by the phone calls supports a conclusion of an ongoing relationship involving shared goals. As for Individual D, she had more than mere knowledge of the conspiracy and was not just Ismael's girlfriend. Rather, she knowingly assisted the Zuno brothers' organization by allowing Jose to store drugs at her residence and by occasionally delivering cocaine to him at his direction. Arguably, there were also other participants in the conspiracy—the "little workers" Jose referenced in a recorded conversation with Rochel to whom the Zunos fronted drugs for further distribution. And there was also the unnamed broker Individual G who was involved in the December 2009 cocaine transaction between Individual F and Jose.

While the Zuno brothers argue that they did not exercise control over Rochel, that is immaterial. A defendant need not exercise control over four other participants for the enhancement to apply; he "need control only one participant." *United States v. Hussein*, 664 F.3d 155, 163 (7th Cir. 2011); *see also United States v. Anderson*, 580 F.3d 639, 649 (7th Cir. 2009) ("To qualify for an enhancement under section 3B1.1, a defendant 'must have been the organizer [or] leader … *of one or more* other

participants' in the charged criminal activity.") (emphasis added) (quoting U.S.S.G. § 3B1.1, cmt. n.2.). And the Zunos clearly controlled their cousin Juan who delivered and picked up cocaine for them at their direction as well as Individual D.

The defendants also argue that given the small size of their criminal enterprise and the limited scope of their planning and preparation, only § 3B1.1(c) should apply. But as the district court determined, the guideline does not require any formal leadership structure or operation. The Zuno brothers' organization had five or more participants; and the defendants do not dispute that they were organizers or leaders of that criminal organization. Thus, § 3B1.1(a) by its terms applies.

We find no clear error in the district court's determination that the conspiracy involved five or more participants and no error in its application of the four-level enhancement under § 3B1.1(a) to both Zunos. Thus, we, like the district court, need not consider whether the Zuno organization was "otherwise extensive."

Besides, as to Ismael, it does not matter whether the guideline applies because it is subsumed by the mandatory minimum sentence. A district court lacks discretion to impose a sentence below a statutory mandatory minimum. *United States v. Brucker*, 646 F.3d 1012, 1016 (7th Cir. 2011). Ismael clearly fits the legal elements for the application of the mandatory minimum. But there is also good reason to treat him more harshly. Unlike Jose, he did not reach a plea agreement to avoid it. We may even assume that the government chose not to offer him one, and that is an acceptable exercise of prosecutorial discretion—no improper purpose (like race, gender, etc.)

is suggested. *See United States v. LaBonte*, 520 U.S. 751, 762 (1997) (noting that whether to file a notice under § 851 is "an integral feature of the criminal justice system, and is appropriate, so long as it is not based upon improper factors"); *United States v. Smith*, 502 F.3d 680, 690–91 (7th Cir. 2007) (noting that prosecutorial discretion as to what charges to bring "extends to charges that carry enhanced statutory maximum penalties").

But even if reasons for this exercise of discretion were needed, there were plenty: Ismael had a longer involvement in the relevant drug sales; he continued his involvement in the conspiracy even while incarcerated; and he stored a firearm with the drugs—and did so in a household with two children present. That the prior conviction did not count for purposes of Ismael's criminal history is beside the point. *See United States v. Alden*, 527 F.3d 653, 663–64 (7th Cir. 2008) (noting that enhancement for prior drug conviction was proper even if based on the same drug conspiracy as the charged conspiracy). Ismael cannot get the benefit of Jose's plea agreement, not even by arguing that a disparity results. It is a disparity that the law condones.

As for the attribution of the post-incarceration drugs to Ismael, the evidence established that he had a continued interest in the drug trafficking operation and its success. Why else would he continue to get information from Jose about it and criticize Jose's pricing? And why would Individual D continue to provide the stash house and make deliveries on order if it did not serve Ismael's purposes? Prior to and at sentencing, Ismael objected to the drug amount attributed to him by making a disparity argument only. ("It's Mr. Zuno's position … that he is being treated differently than his brother

who he believes is a co-equal in this enterprise." Sent. Tr. 3.) Ismael did not object to the district court's relevant conduct findings and disclaimed any argument about the drug amounts attributed to the whole conspiracy, *see* Sent. Tr. 5; therefore he waived error, or at the least forfeited any error, in which case we review for plain error, *see United States v. Salem*, 597 F.3d 877, 884 (7th Cir. 2010).

Although the district court may have focused on the reasonable foreseeability of Jose's conduct, it cited to U.S.S.G. § 1B1.3(a)(1)(B), and found that "the PSR correctly finds that [Ismael] is responsible for the drugs sold by Jose Zuno after [Ismael's] incarceration as well as the drugs found at [his] girlfriend's residence after [he] was incarcerated," Sent. Tr. 14, concluding that the "record clearly reflects that [Ismael] remained a member of the conspiracy in spite of his incarceration," *id.* The court's relevant conduct findings are sufficient under plain error review. Jose's cocaine sales that occurred while Ismael was incarcerated were reasonably foreseeable to Ismael, were in furtherance of their drug distribution conspiracy, and occurred within the commission of the conspiracy. We find no clear error in the district court's determination of the quantity of cocaine attributable to Ismael. Besides, any error in the drug quantity finding was harmless given the application of the mandatory minimum sentence. *See United States v. Easter*, 553 F.3d 519, 523 (7th Cir. 2009).

### III. CONCLUSION

The defendant-appellants' sentences and the district court's judgments are AFFIRMED.