# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 97-1943

———————

| | | |
|---|---|---|
| University of Iowa Hospitals and Clinics, | * | |
| | * | |
| | * | |
| Plaintiff - Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Southern District of Iowa. |
| Donna E. Shalala, in her Official | * | |
| Capacity as Secretary of the Department | * | |
| of Health and Human Services, | * | |
| | * | |
| Defendant - Appellee. | * | |

———————

Submitted: December 16, 1998

Filed: June 8, 1999

———————

Before MURPHY, JOHN R. GIBSON, and MAGILL, Circuit Judges.

———————

JOHN R. GIBSON, Circuit Judge.

The University of Iowa Hospitals and Clinics commenced this action in the district court to appeal the Secretary's determination of the Hospital's "per resident amount" under the Medicare program,[1] which determines the reimbursement made

———————

[1] The Administrator of the Health Care Financing Administration acts on behalf of the Secretary and issued the decision that the Hospital challenges. Consistent with

annually to the Hospital (and other teaching hospitals like it) for Medicare's share of the costs of graduate medical education. The Secretary and the Hospital both moved for summary judgment, and the district court substantially upheld the Secretary's decision.[2] The Hospital appeals, attacking the Secretary's interpretation (embodied in an informally distributed booklet entitled Questions and Answers Pertaining to Graduate Medical Education) of various Medicare regulations under which the costs that determine the "per resident amount" are calculated and documented. It also challenges the factual findings underlying its particular "per resident amount." We affirm in part, reverse in part, and remand the case to the district court with instructions to remand to the Secretary for further proceedings consistent with this opinion.

Under the Medicare program, participating hospitals are reimbursed by the government for the cost of health care services provided to eligible patients. The Health Care Financing Administration administers Medicare with the assistance of private organizations known as fiscal intermediaries. Most intermediaries are insurance companies, and they review the reimbursement requests and other claims made by participating hospitals.

"Graduate medical education" refers to the training that hospitals such as the University of Iowa provide to interns and residents who have recently graduated from medical school. Such training occurs almost exclusively in clinical settings, and it often involves health care services that are covered by Medicare. Therefore, Medicare shares in the costs of graduate medical education when Medicare patients receive

the relevant statute and for purposes of simplicity, we consider the decision to be that of the Secretary, and we generally refer to it as such. See 42 U.S.C. § 1395oo(f)(1) (1994); HealthEast Bethesda Lutheran Hosp. and Rehabilitation Center v. Shalala, 164 F.3d 415, 416 (8th Cir. 1998).

[2]The district court reversed the Secretary's decision with regard to the Hospital's resident compensation costs, but the Secretary does not appeal.

health care services from teaching hospitals. Costs associated with graduate medical education include the salaries and benefits paid to interns and residents, the salaries paid to teaching physicians for the time spent supervising interns and residents, and various overhead and indirect costs.

Medicare's reimbursements for graduate medical education are derived from each teaching hospital's "per resident amount." See 42 U.S.C. § 1395ww(h) (1994). With the help of intermediaries, the Secretary determines a hospital's "per resident amount" by calculating the "average amount recognized as reasonable" for each full time equivalent resident during the "base year," or the fiscal year ending June 30, 1985.[3] See 42 U.S.C. § 1395ww(h)(2) (1994). In years subsequent to the base year, the "per resident amount" is adjusted for inflation rather than being calculated anew. Id. A hospital's total annual Medicare reimbursement for graduate medical education activities is then calculated by multiplying the "per resident amount" by the hospital's number of full time equivalent residents, then discounting this product by the proportion of the hospital's patient load that is covered by Medicare. See 42 U.S.C. § 1395ww(h)(3) (1994).

In 1989, the Secretary promulgated regulations that authorized Medicare intermediaries to re-audit hospitals' FY 1985 graduate medical education costs. See 42 C.F.R. § 413.86 (1998). Among other things, the Secretary was concerned that some hospitals had claimed "questionable" base year costs that Medicare had erroneously reimbursed and would continue to reimburse absent a re-audit of base year costs. See 53 Fed. Reg. 36589, 36591-93 (1988) (commentary on proposed regulations). The Supreme Court recently upheld these regulations, which are not at issue here. See Regions Hosp. v. Shalala, 522 U.S. 448, ---, 118 S. Ct. 909, 914-18 (1998). Thus, the statutory term "recognized as reasonable" refers both to the

---

[3]For the sake of consistency, we refer to the fiscal year ending June 30, 1985, as FY 1985.

Secretary's assessment of a provider's base year costs during the base year itself as well as during the intermediary's later re-audit. 118 S. Ct. at 915-18 (deferring to Secretary's statutory interpretation).

The disagreement between the Hospital and the Secretary arises from the re-auditing of the Hospital's base year graduate medical education costs. In FY 1985, the Hospital's cost report claimed a "per resident amount" of $40,765.[4] Blue Cross and Blue Shield of Iowa serves as the Hospital's Intermediary. At the Secretary's behest, in 1989 Blue Cross began a re-audit of the Hospital's base year graduate medical education costs. During the re-audit, the Blue Cross lowered the Hospital's "per resident amount" from the $40,765 claimed and accepted in 1985 to $33,538. When multiplied by the Hospital's number of full-time equivalent residents, adjusted for the Hospital's percentage of Medicare utilization,[5] and aggregated for all years until the present, the difference between the $40,765 and $33,538 figures amounts to more than $10 million in total Medicare reimbursements.

Nearly all of the difference between the "per resident amount" claimed in FY 1985 and the lower amount accepted in 1989 reflects the Secretary's treatment of the Hospital's office costs. The office costs at issue concern the office space given to all 447 teaching physicians, and the costs primarily reflect depreciation and interest. Throughout these proceedings, the Hospital has argued that these offices are used

---

[4]The $40,765 amount reflects cost of resident and intern salaries; 19.09 percent of the salaries and benefits for 91.5 of the Hospital's 447 teaching physicians, which percentage represented the costs of graduate medical education attributable to those physicians who both teach residents and administer the Hospital's graduate medical education program; 100 percent of the office space costs for all 447 teaching physicians; secretarial costs associated with these offices; and various support costs such as laundry, cafeteria services, and office supplies.

[5]In 1985, about 25 percent of the Hospital's patient care revenue came from Medicare.

exclusively for the administration of its graduate medical education program--except for minimal incidental usage. The offices have no medical or research equipment, and they are not suitable for direct patient care.

At first, Blue Cross disallowed the claimed office costs in their entirety during the re-audit. Blue Cross, acting upon instructions from the Secretary, found inadequate documentation of the Hospital's teaching physician office costs. Specifically, the FY 1985 cost report did not conform to the documentation standards adopted by the Secretary in 1990. The Secretary's new standard required base year time studies to document the usage of the office space as being related to graduate medical education rather than direct patient care, research, or other disallowed expenses. The standard was promulgated and published only informally--in a booklet of "Questions and Answers" provided to intermediaries, which have no specific obligation to pass the information along to providers like the Hospital. Moreover, the Hospital did not keep records of office space usage during FY 1985 because it was never required to do so, and the Secretary enacted the space usage documentation standard more than five years after the fiscal "base year" ended.[6] The Hospital therefore found itself forever unable to meet the Secretary's documentation standard, and the Secretary refused to permit the Hospital to conduct a current time study of office space usage.

The Secretary later retreated from the total disallowance of the Hospital's office costs, but only to a limited extent. Because the documentation detailing the Hospital's base year physician compensation costs no longer existed when Blue Cross re-audited

_____

[6]The Secretary's policy was first published in November 1990, but the base fiscal year ended in June 1985. We reject the Secretary's argument that the 1990 publication merely "clarified" longstanding Medicare policy. The Secretary is unable to direct us to any written indication, before November 1990, that providers were required to create and maintain usage records of teaching physician office space.

-5-

the Hospital's base year graduate medical education costs,[7] the Secretary permitted the Hospital to conduct new time studies of teaching physicians--but <u>only</u> for the purpose of demonstrating the percentage of the physicians' salaries and benefits that were attributable to graduate medical education activities. Thus, the Hospital conducted a physician time study in 1991, and the parties before us agree that 19.99 percent of teaching physicians' time was attributable to operating the graduate medical education program. On this basis, Blue Cross and the Secretary permitted the Hospital to claim 19.99 percent of teaching physician salaries and benefits <u>as well as</u> a like percentage of the previously claimed office space costs. This result was consistent with the standard enacted in November 1990, which reads in relevant part:

> If the provider did not maintain a specific time study on the usage of the office space, the physician's (s') time allocation agreement may be used in its place. However, the physician's (s') "total" hours must be used in the denominator when computing the percentage of time devoted to GME [graduate medical education] functions.

<u>Questions and Answers Pertaining to Graduate Medical Education</u>, No. 24 (Nov. 1990).

The Hospital's objections to the Secretary's solution were, and before us are, several. First, the 19.99 percent figure did not accurately describe the proportion of office space usage devoted to graduate medical education. Although teaching physicians spend only about 20 percent of their time administering the educational program, the offices themselves are used almost solely for educational purposes, the

---

[7]<u>See</u> 42 C.F.R. § 405.481(g)(3) (1989) (requiring record retention for four years). Further, the Secretary determined that the Hospital's base year "allocation agreements" were flawed and did not adequately prove the proportion of time that the Hospital's teaching physicians spent operating the graduate medical education program, but the Secretary permitted the Hospital to document its physician compensation costs through a 1991 time study of teaching physicians.

-6-

Hospital argued. Second, the Hospital objected to the Secretary's requirement that space usage be documented by time studies. According to the Hospital's interpretation of the Medicare regulatory scheme, providers need not maintain usage records of office space, and the primary usage of space governs its classification for Medicare reimbursement purposes, quite unlike the task- and time-oriented classification of teaching physician salaries. Third, even if the space usage time study requirement were legitimate, Blue Cross and the Secretary refused to permit the Hospital to prove, by way of a new time study, that the offices existed for educational purposes, or almost exclusively so. Fourth, the time study requirement departed from decades of past practice in which Medicare and the intermediary had both accepted the Hospital's classification of the office space. Fifth and relatedly, the documentation requirement arose five years after the information that might satisfy it ceased to be available. In this sense, the Secretary imposed a retroactive record-keeping requirement, the Hospital argued.

The Hospital also objected to the intermediary and Secretary's treatment of secretarial costs as well as laundry and cafeteria services connected with the disputed teaching physician office space. The intermediary disallowed the Hospital's claim for six full-time equivalent secretaries, finding inadequate documentation. As for laundry and cafeteria services, the intermediary treated these as physician compensation and therefore applied the physician time study and permitted 19.99 percent of these costs to be classified as education-related. The intermediary prohibited altogether the comparatively modest claim for office supplies.

Finally, during the re-audit, the Hospital supplemented its claim for teaching physician compensation costs. Although the Hospital had originally claimed only a percentage of the salaries and benefits of 91.5 of its 447 teaching physicians, it increased this claim in 1993 to encompass all 447 teaching physicians. At the Secretary's direction, Blue Cross denied the Hospital's "supplemental" claim.

The Hospital appealed the intermediary's "notice of average per resident amount" to the Provider Reimbursement Review Board within the Health Care Financing Administration. The Board reversed Blue Cross's treatment of the Hospital's office costs and other overhead costs, finding these costs reasonable and adequately documented under the relevant Medicare Regulations. It affirmed the intermediary's rejection of the Hospital's "supplemental" claim for additional teaching physician compensation costs, however. The Administrator of the Health Care Financing Administration, who acts on the Secretary's behalf, in turn reversed the Board's decision with respect to the Hospital's office space and other overhead costs. The Administrator concluded that the Hospital did not adequately document its office space costs as being fully related to graduate medical education. Further, the Administrator disallowed the Hospital's claim for secretarial costs in its entirety, approved the intermediary's treatment of the Hospital's cafeteria and laundry costs, but permitted the Hospital to claim the office supply costs that it had sought. Finally, the Administrator affirmed the Board's rejection of the Hospital's claim for additional teaching physician compensation costs.

Pursuant to 42 U.S.C. § 1395oo(f) (1994), the Hospital appealed the Administrator's decision to the district court. Among other things, the district court largely upheld the Administrator's decision (in effect, the Secretary's decision) regarding the Hospital's office space and overhead costs. The court generally accepted the Secretary's application of the 1991 physician time studies to the determination of the Hospital's allowable office space expenses, but it modified the Secretary's decision so as to allow a somewhat greater percentage of the office costs. Meanwhile, the district court affirmed the Administrator's decision with respect to secretarial costs, laundry and cafeteria costs, and the "supplemental" claim for additional teaching physician compensation costs.

This appeal followed. The Hospital continues to maintain that all of its teaching physician office space should be treated as part of its graduate medical education

program, as should its related costs for clerical, laundry, and cafeteria services. The Hospital continues to claim portions of the salaries and benefits of all 447 teaching physicians, but it presses this claim only conditionally and only to the extent that we deny its claimed office and overhead costs. In other words, the Hospital seeks additional salary reimbursement only up to the total amount of base year graduate medical education costs that it originally claimed in FY 1985. The Secretary argues that the Administrator's decision was not contrary to law, arbitrary and capricious, or unsupported by substantial evidence. She defends the Administrator's decision rather than the district court's. We reverse the judgment of the district court with respect to the Hospital's teaching physician office costs, we affirm the district court's treatment of the related secretarial, laundry and cafeteria expenses as well as its denial of the Hospital's claim for additional teaching physician compensation costs, and we remand the case to the district court with instructions to remand to the Secretary for further proceedings consistent with this opinion.

## I.

The Hospital first asserts that its "per resident amount" should be based upon 100 percent of the office costs for its teaching physicians. The Hospital makes many arguments, but they are essentially twofold. First, it argues that the Secretary's requirement that office space usage be documented with time studies from FY 1985 creates an impermissible retroactive rule and is otherwise inconsistent with the Medicare regulatory scheme. Second, it attacks the Secretary's treatment of the office space on factual grounds, arguing that the record does not support the conclusion that the offices in question are used for any purposes but graduate medical education.

## A.

The relevant Medicare statute provides that judicial review shall be governed by the Administrative Procedure Act as set forth in 5 U.S.C. § 706 (1994). See 42 U.S.C.

§ 1395oo(f) (1994).  Thus, a reviewing court must set aside an agency action held to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or unsupported by substantial evidence.  See 5 U.S.C. §§ 706(2)(A), (E) (1994). Judicial review under the APA involves questions of law, and we review the district court's conclusions de novo.  See Shalala v. St. Paul-Ramsey Medical Center, 50 F.3d 522, 527 (8th Cir. 1995).

The requirement that office space usage be documented with base year time studies, first enacted by the Secretary in November 1990, is itself an interpretation of two general Medicare record-keeping regulations:  42 C.F.R. §§ 413.20 and 413.24 (1998).[8]  We accord substantial deference to an agency's interpretation of its own regulation.  See Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945); Appley Bros. v. United States, 164 F.3d 1164, 1173 (8th Cir. 1999).  So long as the interpretation does not violate the Constitution or a federal statute, we will reject it only if it is "plainly erroneous or inconsistent with the regulation."  Seminole Rock, 325 U.S. at 414; Stinson v. United States, 508 U.S. 36, 45 (1993).  Nevertheless, an agency may not interpret a regulation so as to violate a statute.  See, e.g., United States v. LaBonte, 520 U.S. 751, 756-63 (1997) (amended commentary to sentencing guideline held to violate plain language of statute underlying particular guideline).

We first address the Hospital's argument that the Secretary may not apply the space usage documentation standard retroactively.  To determine whether a rule is retroactive, we must ask "whether the new provision attaches new legal consequences to events completed before its enactment." Landgraf v. USI Film Prods., 511 U.S. 244, 270 (1994).  So defined, retroactive prescriptions are disfavored in the law.  See id. at

---

[8]Because the relevant portions of these two regulations have not changed since their enactment in 1986 and because the Secretary does not cite a particular year's version in support of the challenged space usage documentation standard, we refer to the most recent codification of the regulations.

265 ("Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted."); Regions Hosp. v. Shalala, 522 U.S. 448, ---, 118 S. Ct. 909, 914-15 (1998) (ordinarily, legality of conduct should be assessed under law that existed when conduct took place); Health Ins. Ass'n of America, Inc. v. Shalala, 23 F.3d 412, 425 (D.C. Cir. 1994) (courts cannot award Health Care Financing Administration recovery out of deference to interpretive rules that did not exist when transactions at issue were conducted; Secretary may only rely upon statutory and regulatory provisions in effect at time of relevant transactions), cert. denied, 513 U.S. 1147 (1995). Because of retroactivity's disfavored status, statutes are presumed to operate only prospectively. See Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208 (1988). As a further result, when Congress delegates legislative authority to an administrative agency, courts will presume that the delegation forbids the agency from creating retroactive prescriptions, and only express congressional authorization will overcome this presumption. See id. We must therefore decide whether the Secretary has created a retroactive rule, and, if so, whether the Secretary has statutory authority to do so.

The space usage documentation standard set out in the "Questions and Answers" booklet creates a retroactive rule. Enacted in November 1990, the rule requires hospitals to have undertaken time studies of office space usage during the base year-- five years before the standard's enactment. If a provider failed to undertake the required time studies during its base year (when it lacked any notice that it was required to do so), its reimbursement for teaching physician office space is reduced to the percentage of physicians' time that is spent in graduate medical education activities. Although a prescription "is not made retroactive merely because it draws upon antecedent facts for its operation," Regions Hosp., 118 S. Ct. at 915 (quotation omitted), the rule in question does not merely require the application of antecedent facts. Nor does it simply call for "application of the cost reimbursement principles in effect at the time the costs were incurred." See id. Rather, the time study requirement

-11-

creates a new reimbursement principle because it "change[s] the standards under which the base year costs are to be determined"--at a time when those standards cannot be met because the data no longer exist and cannot be created. See id. (quoting Toledo Hosp. v. Shalala, 104 F.3d 791, 795 (6th Cir. 1997)). In this sense, the rule "attaches new legal consequences to events completed before its enactment." Landgraf, 511 U.S. at 270.

Several inequities surround the Secretary's approach to the Hospital's teaching physician office costs. First, the Hospital had no notice of the space usage time study requirement until five years after the requirement could be satisfied. The Secretary and the intermediary had always accepted the Hospital's claim for the office space, and no statute, regulation, or administrative statement even hinted at the Secretary's new requirement.[9] Second, the Secretary refused to permit the Hospital to provide a current time study to meet the November 1990 standard's requirement of a base year time study. Third, the standard's retroactive application has resulted in substantial underpayments to the Hospital (by its account, some $10 million dating back to the intermediary's re-audit). Fourth, the Secretary's approach perpetually "locks in" these underpayments because each subsequent year's reimbursement depends upon the inflation-adjusted "per resident amount" for the base year.

Having concluded that the Secretary imposed a retroactive prescription upon the Hospital, we consider whether the underlying Medicare statutes expressly permit the Secretary's approach. The Secretary's brief nowhere even suggests a possible

---

[9]The plain language of the general record-keeping regulations relied upon by the Secretary does not provide advance notice of the new record-keeping requirement. See 42 C.F.R. §§ 413.20, 413.24. Section 413.20 merely requires providers to "maintain sufficient financial records and statistical data for proper determination of costs payable under the program." Section 413.24 requires providers to furnish "adequate cost data" that "must be based on their financial and statistical records which must be capable of verification by qualified auditors." See 42 C.F.R. § 413.24(a), (c).

statutory basis for imposing retroactive record-keeping standards upon Medicare providers,[10] and our own research reveals no such authorization. Because the Secretary relies upon the general record-keeping regulations at 42 C.F.R. §§ 413.20, 413.24, we turn to the statutory bases of those regulations to determine whether Congress has expressly permitted the Secretary to enact retroactive documentation requirements of hospitals' graduate medical education costs. The statutory authority for those regulations is as follows: 42 U.S.C. §§ 1302, 1395f(b), 1395g, 1395l, 1395l(a), (i) and (n), 1395x(v), 1395hh, 1395rr, 1395tt, and 1395ww (1994). See 42 C.F.R. Ch. IV, Subch. B, Pt. 413, Authority (1998). We have carefully examined the lengthy texts of these statutory provisions, and we find no support for the Secretary's retroactive record-keeping requirement. Accord Georgetown Univ. Hosp., 488 U.S. at 209, 213-15 (general authority to promulgate cost limit rules in sections 1395x(v)(1)(A), 1395hh, and 1395ii held not to permit Secretary to enact retroactive cost limits); id. at 209-13 (Secretary's statutory authority to "provide for the making of suitable retroactive corrective adjustments" in subsection 1395(x)(v)(1)(A)(ii) only permits case-by-case adjustments to reimbursement where regulations prescribing computation methods reach incorrect result in individual cases). Insofar as the Secretary's standard penalizes providers for not meeting a documentation requirement five years before the enactment of that requirement, we must reject the standard.

---

[10]The Secretary argues that her approach is consistent with the statutory framework setting out the "per resident amount" methodology for calculating reimbursable graduate medical education expenses, see 42 U.S.C. § 1395ww(h), the enactment of which followed Congress's intent in 1986 to establish "a new and presumably more accurate methodology for reimbursing GME costs." Appellee's Br. at 29. Whether or not the Secretary has accurately described Congress's intent and whether or not the challenged rule furthers that intent, the Secretary does not refer us to any express congressional authorization to enact retroactive documentation standards for graduate medical education expenses.

Aside from the rule's retroactivity, the Hospital makes several other arguments attacking the Secretary's space usage time study requirement. In particular, the Hospital argues that the requirement to produce a time study of the office space is unsupported by the general Medicare record-keeping regulations, and that the requirement deserves little deference because it was not enacted contemporaneously with the regulations it interprets and was not the product of notice-and-comment rulemaking. Furthermore, the Hospital contends that the time study requirement contradicts decades of past practice by the Secretary, intermediaries, and providers alike, and that it departs from various current Medicare practices under which the primary usage of space (rather than the particular percentage of its usage for various purposes) governs Medicare's reimbursement of the space. In essence, these arguments assert not only that the Secretary may not retroactively require providers to conduct a time study of teaching physician office space usage, but that the Secretary may not enact any such requirement at all.

We decline to address these arguments for two reasons. First, we review only what the Secretary did, not what she might have done. See Securities & Exchange Comm'n v. Chenery Corp., 318 U.S. 80, 93-94 (1943) (legality of agency's action depends upon what agency actually did). The Secretary has never attempted to impose the time study requirement prospectively against the Hospital; in fact, she has expressly refused to do so despite requests by the Hospital to adjust its reimbursement based on a current time study of office space usage. Because the Secretary has not sought to impose the time study requirement prospectively, we should not address whether the law would permit her to. Second, the Hospital has acquiesced to the time study requirement's prospective application. It requested such an application below, and its reply brief restates the Hospital's willingness to undertake a current time study of the office space. See Appellant's Reply Br. at 7 n.2: "UIHC had no notice by regulation or manual that this space documentation would be required. If creating such records now and relating them back to 1985 is viewed as desirable by the Court, UIHC would be pleased to do so. UIHC has not compiled usage records to date because the

-14-

Secretary has been emphatic that the only time subsequent year records will be accepted is for physician time studies."

On remand, the Secretary must determine the proportion of the teaching physician office space usage that relates to the Hospital's graduate medical education program.[11]  Among the range of choices available to her, the Secretary might (i) require the Hospital to undertake a current time study of office space usage,[12] or (ii) derive, based on the current record or after further proceedings, the percentage by which the teaching physician offices are used for graduate medical education.  We leave the choice to the Secretary's sound discretion, but any finding is subject to judicial review and must be supported by substantial evidence.

## B.

The Hospital also attacks the Secretary's treatment of the teaching physician office costs on evidentiary grounds.  We must assess whether the Secretary's decision, as expressed by the Administrator of the Health Care Financing Administration, is supported by "substantial evidence."  See 5 U.S.C. § 706(2)(E).  "Substantial evidence" is more than a scintilla but less than a preponderance of the evidence; it is

---

[11]Once this proportion is determined, the Secretary must adjust the Hospital's previous reimbursements dating back to the re-audit, when the office space claim was initially disallowed (then later somewhat increased).  The Hospital's future reimbursements -- predicated upon the "base year" -- should employ this same proportion.

[12]This holding results from the Hospital's stated willingness to conduct a current time study.  Again, aside from the retroactive effect of the Secretary's space usage documentation standard, we express no opinion as to the legality of the requirement that office space usage be documented with time studies or of the consequences that result from a provider's failure to produce time studies--so long as those consequences operate prospectively.

"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Donaho v. FMC Corp., 74 F.3d 894, 900 n.10 (8th Cir. 1996) (citation omitted).

By its own terms, the Secretary's space usage documentation standard applies only when teaching physicians use offices both for graduate medical education purposes and other purposes. See Questions and Answers Pertaining to Graduate Medical Education, No. 24 (Nov. 1990). The Hospital argues that the record contains no evidence that the offices are used for any non-educational purposes, other than incidentally. On this basis, the Hospital argues that the time study requirement does not apply to it at all, much less retroactively. We are not persuaded. First, the Hospital's very argument concedes that at least "incidental" usage of the office space is not related to graduate medical education. Second, substantial evidence suggests that the offices are not used solely for reimbursable activities. Kenneth H. Yerington, the Hospital's Director of Financial Management and Control, testified before the Provider Reimbursement Review Board that it was "conceivable" that teaching physicians incidentally used the offices for purposes other than graduate medical education. Yerington further conceded that the offices were used for "academic endeavors, including research funded by grants," and the Hospital's Medicare cost report reduced the claimed office costs to account for the use of the offices for research and administrative activities (a surprising fact if the offices are used solely for reimbursable graduate medical education activities). Third, the language of the time study requirement does not make an exception for "incidental" non-reimbursable space usage.

Nevertheless, we also reject the Secretary's argument that substantial evidence supports the Administrator's decision to limit the Hospital's office space claim to the percentage of time that teaching physicians spent pursuing graduate medical education activities--about 20 percent. The Secretary argues that the allocation of teaching physicians' time provides substantial evidence of how their offices are used. We do

not believe that the record supports the Secretary's conflating of physician time with office time. Yerington's testimony as well as photographs of the office space in question demonstrate that much of the physicians' activities (especially patient care, and to a lesser extent many administrative and research activities) cannot be conducted in the small and sparsely furnished offices, which lack medical equipment. Thus, substantial evidence supports the conclusion that less than 100 percent of the office space usage is related to graduate medical education, but it does not support the conclusion that only 20 percent of the office space usage is so related.

**II.**

The Hospital also appeals the district court's affirmance of the Secretary's treatment of the clerical, laundry, and cafeteria expenses. These costs are modest when compared to the disputed office costs themselves. The Secretary disallowed the Hospital's claim for six full-time equivalent secretaries who assisted the teaching physicians' graduate medical education activities; further, the Secretary permitted the Hospital to claim about 19 percent of related laundry and cafeteria expenses--reflecting the percentage of time that teaching physicians spent operating the graduate medical education program. In these two respects, we affirm the judgment of the district court.

Turning first to the Hospital's secretarial costs, the Secretary's policy permits reimbursement for clerical costs so long they are "attributable to teaching physicians." Questions and Answers Pertaining to Graduate Medical Education, No. 48, (Nov. 1990). The Secretary may classify such clerical costs as related to graduate medical education "based upon the portion of physician time allocated to GME." Id. The Hospital did not demonstrate which clerical expenses were related to graduate medical education and which were not. Rather, the Hospital's calculation of secretarial costs simply assumed that the costs were a set percentage of faculty costs--a percentage derived from an unidentified and undated university-wide study. The Secretary therefore concluded that the Hospital's claim failed under the general Medicare regulations requiring providers to supply adequate and auditable documentation, see

42 C.F.R. §§ 413.20, 413.24, and disallowed the claimed secretarial costs in their entirety.

The Hospital argues that its secretarial costs have always been permitted in the past and that the costs themselves (six secretaries for the teaching duties of 447 physicians) are reasonable. We are not persuaded. To be reimbursable, the costs claimed by providers need not only be reasonable, see 42 U.S.C. § 1395ww(h)(2), but must also be adequately documented. See 42 C.F.R. §§ 413.20, 413.24. Unlike the evidence presented by the Hospital to demonstrate the purpose and general usage of the teaching physician offices, the Hospital's documentation did not even purport to show what portion of the claimed secretarial costs, if any, were related to graduate medical education. We conclude that the Secretary's treatment of the clerical expenses permissibly interprets the regulations relied upon and is supported by substantial evidence. See 42 C.F.R. § 413.24(a) (1998) ("Providers . . . must provide adequate cost data. This must be based on their financial and statistical records which must be capable of verification by qualified auditors."). Nor do we believe that the Secretary abused her discretion or acted arbitrarily and capriciously by rejecting the Hospital's claim outright, rather than permitting the Hospital another chance to document its clerical expenses. The relevant Medicare regulations place upon the Hospital the obligation to substantiate the costs that it claims, and the Secretary may generally deny reimbursement when presented with inadequate documentation. See Girling Health Care, Inc. v. Shalala, 85 F.3d 211, 215 (5th Cir. 1996); Daviess County Hosp. v. Bowen, 811 F.2d 338, 346-47 (7th Cir. 1987).

We also reject the Hospital's argument that the claimed laundry and cafeteria costs should be treated as fully related to graduate medical education. The Secretary treated these costs as physician compensation and allowed them to be claimed accordingly--i.e., in proportion to the percentage of physicians' time spent pursuing graduate medical education activities. The Hospital has not proven that these expenses compensate teaching physicians solely for graduate medical education activities, rather

than for patient care, research, administration, and other duties.  We cannot conclude that the Secretary's approach violates any relevant regulations, that it is arbitrary and capricious, that it is unsupported by substantial evidence, or that it constitutes an abuse of discretion.

## III.

Finally, we reject the Hospital's argument that it should be allowed the additional physician compensation costs requested in 1993 and over and above those originally sought in FY 1985.  In its FY 1985 cost report, the Hospital claimed 19.09 percent of the compensation for 91.5 teaching physicians.  Eight years later, faced with the intermediary's rejection of the Hospital's claimed office costs, it attempted to claim 19.99 percent of the compensation for all 447 teaching physicians.[13]

Throughout these proceedings, the intermediary, the Provider Reimbursement Review Board, the Administrator of the Health Care Financing Administration, and the district court have rejected the Hospital's "supplemental" physician compensation claim for the same reason, relying upon the Medicare "anti-redistribution" rule in 42 C.F.R. § 413.85(c) (1998).  In relevant part, the regulation provides as follows:

> Although the intent of the program is to share in the support of educational activities customarily or traditionally carried on by providers in conjunction with their operations, it is not intended that this program should participate in <u>increased costs resulting from redistribution of costs from educational institutions or units to patient care institutions or units</u>.

---

[13]The 19.99 percent figure is based upon the 1991 time study, which showed that teaching physicians spent 19.99 percent of their time operating the Hospital's graduate medical education program.

(emphasis added).  The "anti-redistribution" rule provides that educational activities will not be reimbursed when they result from a "redistribution," or shift, of costs from an educational facility to a patient care facility.  See Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 514 (1994). The rule serves to ensure that Medicare will bear the costs of graduate medical education only if those costs are not already borne by the Hospital or the community in some other way.

Because the Hospital claims salary and benefit expenses for an additional 355.5 teaching physicians not previously claimed, the Secretary ruled and now argues that the claim seeks a prohibited redistribution of costs.  The Hospital, on the other hand, only seeks its "supplemental" claim to the extent that its office and other overhead expenses are denied.  In other words, the Hospital does not seek to exceed the total expenses (approximately $4.6 million) claimed in its 1985 cost report; it only asks that the "supplemental" claim be permitted to substitute for those base year claims that are disallowed.  On this basis, the Hospital argues that the "anti-redistribution" rule does not apply because its claim seeks no increase in total base year costs.

In essence, the Hospital and the Secretary present us with two competing interpretations of the "anti-redistribution" regulation.   Under the Hospital's interpretation, there is a "redistribution" only if the total costs claimed today are over and above the total costs claimed in the base year (and thus, the costs not met by other "community" means).  Under the Secretary's reading, by contrast, there is a forbidden "redistribution" if the Hospital receives an increase in any individual category of costs claimed in the base year.  In this case, the Hospital seeks an increase in teaching physician compensation costs but not total costs.

We must decide whether graduate medical education costs should be aggregated or separated for purposes of the "anti-redistribution" rule.  In doing so, we must accept the Secretary's interpretation of the regulation unless it is plainly erroneous or inconsistent with the regulation.  See Stinson v. United States, 508 U.S. 36, 45 (1993);

Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945). The language of the regulation does not compel the interpretation urged by the Hospital, and we therefore give legal force to the Secretary's reading. Accord Thomas Jefferson, 512 U.S. at 515 (The "shift of any reimbursable [cost] from an educational institution or unit to a patient care institution or unit is prohibited.") (quotations omitted and emphasis added). We therefore affirm the district court's judgment insofar as it affirmed the Secretary's denial of the Hospital's claim for further physician compensation costs not claimed during the base year.

## IV.

For the foregoing reasons, we reverse the judgment of the district court insofar as it upheld, while modifying, the Secretary's treatment of the Hospital's teaching physician office costs. We otherwise affirm the judgment of the district court, and we remand with instructions to remand the case to the Secretary for further proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.