# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-1986

_____

| | | |
|---|---|---|
| The Human Development Corporation of Metropolitan St. Louis, | * * * | |
| Appellant, | * * | |
| v. | * * * | Appeal from the United States District Court for the Eastern District of Missouri. |
| United States Department of Health and Human Services, The Administration for Children and Families, | * * * * | |
| Appellee. | * | |

_____

Submitted: September 10, 2002

Filed: December 5, 2002

_____

Before WOLLMAN, HEANEY, and BYE, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

The Human Development Corporation of Metropolitan St. Louis (HDC) was the designated Head Start agency for St. Louis, Missouri. The Administration for Children and Families (ACF), an agency within the United States Department of Health and Human Services (HHS), administers the Head Start program. On June 9, 2000, ACF notified HDC that it was disallowing $83,960 for costs related to the purchase of computers and $33,430 for HDC's failure to meet the required twenty

percent non-federal match in fiscal years 1996 and 1997. HDC appealed this decision to the Departmental Appeals Board (Board), which sustained $46,178 of the disallowance related to the computers and upheld the non-federal match disallowance in its entirety. HDC then filed a petition for judicial review of the Board's decision. Both HDC and HHS moved for summary judgment. The district court granted HHS's motion, concluding that the Board's decision "was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." We reverse in part and affirm in part.

## I.  Standard of Review

We review a district court's grant of summary judgment de novo, applying the same standards used by the district court. Gipson v. INS, 284 F.3d 913, 916 (8th Cir. 2002). The parties agree that judicial review of the Board's decision is governed by the Administrative Procedure Act (APA). Under § 706(2) of the APA, we will set aside an agency action if it is "unsupported by substantial evidence," or is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(E), (A).

## II.  Disallowance for Computer Costs

The record indicates that between 1995 and 1997, HDC purchased 119 computers from Bentech, Inc. (Bentech) for its Head Start program. Four purchase orders are included in the record: P.O. HS-622-95-712, dated November 30, 1995, for 17 computers with 486 processors at $2,049 each; P.O. HS-622-95-663,[1] dated November 30, 1995, for 40 computers with 486 processors at $2,099 each; P.O. HS-

_____

[1]There appears to be some confusion regarding this purchase order. It is occasionally referred to as P.O. HS-622-95-633.

622-97-386, dated October 3, 1997, for 22 computers at $2,099 each; and P.O. HS-622-97-414,[2] dated October 23, 1997, for 40 computers at $2,099 each.[3]

On November 12, 1998, ACF notified HDC by letter that HDC's designation as a Head Start grantee would be terminated, effective November 30, 1998. In this letter, ACF asserted that HDC's "property management system lacked procedures and adequate controls to ensure that property purchased with Federal grant funds was safeguarded." According to ACF, "[s]everal purchases had not been properly accounted for in the property records." HDC appealed ACF's termination decision to the Board, and on September 30, 1999, the Board reversed.

Thereafter, the Office of Inspector General contracted with Leon Snead & Company, P.C. (Snead) to review HDC's Head Start program for the period from December 1, 1995, through November 30, 1998. Snead reported that HDC's property management controls were "very weak." More specifically, Snead found equipment that was not listed on HDC's inventory and could not find certain equipment that was included on the inventory. Because of these shortcomings, Snead concluded that "a physical inventory could not be accomplished."

After Snead's report was issued, ACF notified HDC of alleged deficiencies[4] and new noncompliant areas in HDC's Head Start program. ACF again advised HDC

_____

[2]This purchase order is also mistakenly referred to as P.O. HS-622-95-714.

[3]P.O. HS-622-97-386 and P.O. HS-622-97-414 do not specify the type of computer ordered.

[4]The definition of "deficiency" includes "[a] violation of Federal or State requirements . . . which the grantee has shown an unwillingness or inability to correct within the period specified by the responsible HHS official, of which the responsible HHS official has given the grantee written notice . . . ." 45 C.F.R. § 1304.3(a)(6)(iii) (2002).

that its property management system did not sufficiently safeguard property purchased with federal grant funds. HDC was afforded an opportunity to correct the deficiencies and noncompliant items, and ACF later conducted an on-site audit. On June 9, 2000, ACF advised HDC by letter that, after reviewing HDC's responses to the audit report, it was disallowing "costs totaling $84,169.00 for unallowable costs related to duplicate payment for computers and travel advance not refunded . . . ." HDC appealed that portion of the disallowance relating to the computers, which totaled $83,960.

HDC relinquished the Head Start program in the spring of 2000 and moved the Head Start computers to a warehouse shortly thereafter. After receiving the June 9, 2000, disallowance letter, HDC took steps to ensure that it could account for all of the computers purchased with Head Start funds. In July of 2000, HDC employee Dan Todd examined and documented thirty-nine Bentech computers with 486 processors and fifty-nine Bentech computers with AMD 166 processors in HDC's warehouse. Aff. of David S. McDowell ¶ 5.[5] HDC's accounting firm, Baird, Kurtz & Dobson (Baird), also inventoried the Head Start computers. Baird found thirty-nine 486s, fifty-eight machines with AMD 166 chips, and one Pentium machine.[6] Id. ¶ 7.

While its appeal was pending before the Board, HDC learned that it had overlooked P.O. HS-622-95-712. Thus, HDC executive David S. McDowell returned to the HDC warehouse, where he found seventeen additional 486s that were segregated from the other ninety-eight computers. HDC then submitted this information, in affidavit form, to the Board. HDC also submitted documentation

---

[5]HHS has not challenged McDowell's affidavits. We therefore accept the affidavits as factually accurate, notwithstanding minor discrepancies in the documentation supporting HDC's calculations.

[6]In his affidavit, HDC executive David S. McDowell describes the machines with AMD 166 chips as "a Pentium equivalent."

relating to the theft of three computers and the seizure of one computer by the Office of Inspector General.

As noted above, ACF initially indicated that the $83,960 disallowance was based on a duplicate payment for computer equipment. ACF subsequently determined that no duplicate payment had been made and clarified that the issue before the Board was whether HDC had received the computers associated with P.O. HS-622-95-663. According to ACF, there was no way to account for these computers accurately because HDC had failed to record the required information as to each computer upon receipt. See 45 C.F.R. § 74.34(f)(1) (2002) (requiring recipients to maintain accurate and detailed records for equipment purchased with federal funds). HDC did not dispute that there were deficiencies in its property management system, but argued that any such deficiencies were immaterial. HDC contended that the inventories it submitted demonstrated that it had accounted for all but one of the computers on P.O. HS-622-95-663. HDC also suggested that the missing computer was one of those that had been either stolen or confiscated.

On January 4, 2001, the Board determined that although HDC had failed to comply fully with the property management standards governing grant recipients, "[t]his does not definitely show that the computer costs should be disallowed . . . ." "Instead," the Board explained, "it places a burden on HDC to account for the computers in a way that satisfactorily overcomes the questions raised by its failure to comply. The Board then concluded that HDC could account for only eighteen of the forty computers and therefore sustained the disallowance as to the cost of the remaining twenty-two computers. It is from the district court's ruling upholding this decision that HDC has now appealed.

On appeal, HDC challenges the Board's method of determining whether it had satisfactorily accounted for the forty computers. HDC also contends that the evidence it submitted to the Board demonstrated that it had accounted for all 119 computers it

-5-

acquired from Bentech pursuant to the four purchase orders discussed above, including the 40 computers associated with P.O. HS-622-95-663. After reviewing the record, we agree with HDC's position.

Initially, we turn to an argument raised by HHS. According to HHS, the evidence indicates that HDC purchased more than 150 computers from Bentech for use in the Head Start program. The evidence to which HHS refers is HDC's close-out inventory of equipment purchased with Head Start funds. As HDC states in its reply brief, however, "[it] has always admitted that its inventory records were inaccurate." Furthermore, although the close-out inventory was included in the materials submitted to the Board, the Board made no specific findings regarding the number of computers HDC had purchased from Bentech. Instead, the Board simply noted that there were four purchase orders in the record. These orders, as discussed above, indicate that HDC acquired a total of 119 Bentech computers between 1995 and 1997. For these reasons, we are not persuaded by HHS's argument regarding the number of computers HDC purchased for the Head Start program.

Next, we turn to HDC's attempt to account for the forty computers associated with P.O. HS-622-95-663. The Baird inventory report included ninety-eight Bentech computers, thirty-nine of which were 486s,[7] fifty-eight of which had AMD 166 chips, and one of which was a Pentium machine. Aff. of David S. McDowell ¶ 7. Dan Todd's inventory report listed essentially the same computers. Id. ¶ 5. David McDowell's affidavit indicates that he personally viewed seventeen additional 486s that were segregated from the other Bentech computers. Supplemental Aff. of David S. McDowell ¶ 2. HDC attributes the fifty-six 486s to P.O. HS-622-95-712 and P.O.

---

[7]The Board noted that "the [Baird] inventory lists 38 486 computers, not 39 as represented by HDC, since one serial number appears twice." Our review of inventory report indicates that the Board is correct. Nevertheless, the "HDC Tag #['s]" of these computers are different, leading us to believe that the duplicate serial number was merely a typographical error.

HS-622-95-663, and the remaining fifty-nine computers to P.O. HS-622-97-386 and P.O. HS-622-97-414. Thus, of the 119 computers associated with these purchase orders, the Baird, Todd, and McDowell inventories account for 115.[8] HDC's documentation regarding three stolen computers and a confiscated computer appears to account for the remaining four.

Finally, we turn to the Board's method of determining whether HDC had "adequately accounted for" the forty computers associated with P.O. HS-622-95-663. As noted above, the Board acknowledged that HDC's failure to comply fully with applicable property management standards "[did] not definitively show that the computer costs should be disallowed . . . ." Despite this initial acknowledgment, the Board then essentially relied on HDC's admittedly deficient inventory records to demonstrate that HDC could not account for twenty-two of the forty computers. The Board simply did not address HDC's calculations. As discussed above, these calculations indicate that HDC has accounted for the 119 computers purchased from Bentech, including the 40 computers associated with P.O. HS-622-95-663. Thus, we conclude that the Board's decision is not supported by substantial evidence on the record as a whole. See Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987) ("In the review of an administrative decision, '[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'" (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)). Accordingly, we

_____

[8]HHS notes that P.O. HS-622-97-414 does not identify the type of computer ordered. HHS then explains that because the amount paid for computers acquired pursuant to this purchase order and P.O. HS-622-95-663 was identical, its auditors concluded that identical types of computers were purchased. This conclusion, however, is contradicted by other evidence in the record, including the inventory reports submitted by HDC.

reverse the district court's judgment with respect to the computer disallowance. HDC was and is entitled to summary judgment on that issue.[9]

### III.  Disallowance for Failure to Meet Non-Federal Match

The Head Start Act (Act) provides that federal financial assistance to Head Start programs "shall not exceed 80 percent of the approved costs of the assisted program or activities," unless the Secretary determines that certain circumstances justify additional funding. 42 U.S.C. § 9835(b).  The Act also prohibits the Secretary of Health and Human Services (Secretary) from "requir[ing] non-Federal contributions in excess of 20 percent of the approved costs of [Head Start] programs or activities . . . ." Id.  A department-wide regulation outlines the applicable cost sharing or "matching" requirements.  See 45 C.F.R. § 74.23 (2002); 45 C.F.R. § 1301.10(a) (2002).  This regulation provides in relevant part:

> (a) To be accepted, all cost sharing or matching contributions, including cash and third party in-kind, shall meet all of the following criteria:
> (1)  Are verifiable from the recipient's records;
> (2)  Are not included as contributions for any other federally-assisted project or program;
> (3)  Are necessary and reasonable for proper and efficient accomplishment of project or program objectives;
> (4)  Are allowable under the applicable cost principles;
> (5)  Are not paid by the Federal Government under another award, except where authorized by Federal statute to be used for cost sharing or matching;
> (6)  Are provided for in the approved budget; and
> (7)  Conform to other provisions of this part, as applicable.

45 C.F.R. § 74.23(a).

_____

[9]Because we have determined that HDC is entitled to summary judgment, we need not address its additional arguments related to the computer disallowance.

As discussed above, Snead reviewed HDC's Head Start program for the period from December 1, 1995, to November 30, 1998. Snead reported that HDC had "failed to provide the required 20 percent non-federal match in the amount of $33,430" for fiscal years 1996 and 1997. HDC did not dispute this finding, but explained that the shortfall resulted from an error on the part of its accountants. According to HDC, its accountants were unaware of a 1992 revision to the applicable regulations. After learning about the revision, however, the accountants apparently reviewed their records for the relevant time period and determined that HDC had reported only a non-federal match amount that was sufficient to meet the perceived regulatory requirement, with the balance going unreported. This unreported balance consisted of contributions to three other programs. HDC argues that these contributions exceeded the shortfall identified by Snead.

The Board rejected this argument and sustained the disallowance. In doing so, it found that the contributions made to the three other programs were not part of the "approved costs of [the Head Start] program or activities." 42 U.S.C. § 9835(b). The Board also noted that HDC had failed to include these contributions in its "approved budget," as required by 45 C.F.R. § 74.23(a)(6).

HDC challenges the Board's determination on the non-federal match issue as arbitrary and capricious. According to HDC, the Board's analysis conflicts with the "plain language" of § 74.23(a). As an initial matter, we agree with HHS that this argument is based on HDC's mischaracterization of the Board's holding and is therefore without merit. Furthermore, "[w]e accord substantial deference to an agency's interpretation of its own regulation."[10] Univ. of Iowa Hosps. & Clinics v.

_____

[10] In doing so, we reject HDC's claim that "[t]he District Court improperly gave the [Board's] decision Chevron deference." See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984); United States v. Mead Corp, 533 U.S. 218 (2001). We agree with the district court that "[t]he Department of Health and Human Services is specifically empowered to promulgate regulations concerning the Head

Shalala, 180 F.3d 943, 950-51 (8th Cir. 1999) (citations omitted); see also Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) ("We must give substantial deference to an agency's interpretation of its own regulations." (citations omitted)). Our review of the record satisfies us that the Board's interpretation was neither "plainly erroneous" nor "inconsistent with the regulation." Univ. of Iowa Hosps., 180 F.3d at 951 (citations omitted). Likewise, we see no basis for concluding that the Board's determination on the non-federal match issue was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). We therefore affirm the district court on this issue.

## IV.  Conclusion

We reverse the district court's judgment for HHS with respect to the computer disallowance. Summary judgment should be entered in favor of HDC on that issue. In all other respects, the judgment is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

Start program." See, e.g., City of New York v. Shalala, 34 F.3d 1161, 1166-67(2d Cir. 1994); 42 U.S.C. § 9836a(a).