**Edward A. KILEY, et al.   Plaintiffs,**

v.

**FEDERAL BUREAU OF PRISONS, et al.   Defendants.**

**No. CIV. L–03–3100.**

United States District Court, D. Maryland.

Sept. 2, 2004.

James Wyda, Office of the Federal Public Defender, Baltimore, MD, Kelli Colleen McTaggart, Office of the Federal Public Defender, Greenbelt, MD, for Plaintiff.

Melissa M. Moore, Office of the Public Defender, Baltimore, MD, for Intervenor Plaintiff.

Ariana Wright Arnold, James A. Frederick, Jamie M. Bennett, Office of the United States Attorney, Baltimore, MD, for Defendants.

### MEMORANDUM

LEGG, Chief Judge.

When a Federal defendant receives a sentence of imprisonment, the Bureau of Prisons ("BOP") selects the place of confinement. The BOP "may designate any available penal or correctional facility." 18 U.S.C. § 3621(b). Before December of 2002, the BOP frequently assigned prisoners facing short sentences to a community confinement center or a half-way house.[1]

On December 20, 2002, the BOP announced that all sentences of imprisonment, however short, must be served in a traditional prison. In making the announcement, the BOP relied on an opinion

---

1. Among other factors, the BOP considered: (i) the sentencing judge's recommendation; (ii) the length of the sentence; and (iii) whether the defendant had been convicted of a violent crime. *See Iacaboni v. United States,* 251 F.Supp.2d 1015, 1017 (D.Mass.2003).

letter from the Department of Justice ("DOJ"). The DOJ's Office of Legal Counsel advised that community confinement did not qualify as "imprisonment."

This case tests whether the new BOP policy, and the opinion letter on which it relies, correctly interpret 18 U.S.C. § 3621(b). As explained below, the Court finds the BOP's interpretation unpersuasive. Accordingly, the Court will DENY IN PART and GRANT IN PART the government's pending motion for summary judgment. (Docket No. 26.) The Court will hold a conference to schedule further proceedings.

## I. BACKGROUND

On September 2, 2002, pursuant to an agreement with the government, Edward Kiley pleaded guilty to two counts of securities fraud. On December 20, 2002 (after Kiley pleaded guilty, but before he was sentenced), the BOP announced that it would no longer designate to a CCC anyone sentenced to a term of imprisonment.[2] BOP Director Kathleen Sawyer stated that the change in practice "follows recent guidance from the U.S. Department of Justice's Office of Legal Counsel (OLC), finding that the term 'community confinement' is not synonymous with 'imprisonment.'"

Director Sawyer also explained that "[t]he OLC has determined that the Bureau's practice of using CCCs as a substitute for imprisonment contravenes well-established case law, and is inconsistent with U.S.S.G. § 5C1.1." (Id.) According to Director Sawyer, no new prisoners would be assigned to a CCC. Those prisoners who had already been designated to a CCC would be reassigned to a prison if they had more than 150 days then remaining on their terms.

On June 13, 2003, this Court sentenced Kiley to twelve months and one day of imprisonment. The BOP designated Kiley to a federal prison camp in Goldsboro, North Carolina.

After being designated, Kiley filed the instant suit under the Administrative Procedures Act ("APA"). The suit argues that the new practice: (i) violates the Due Process Clause; (ii) violates the Equal Protection Clause; (iii) violates the Ex Post Facto Clause; (iv) violates the APA for lack of notice and comment; (v) conflicts with governing laws; and (vi) constitutes an unauthorized retroactive rule.

On May 3, 2003, pursuant to an agreement with the government, Joyce Elaine Haspert pleaded guilty to one count of theft of government property. On October 6, 2003, the Court sentenced Haspert to four months of imprisonment.[3] The BOP designated Haspert to a federal prison in Danbury, Connecticut.

On February 9, 2004, Haspert moved to intervene in Kiley's suit.[4] The Court granted the unopposed motion and established a common briefing schedule. On March 3, 2004, the BOP moved to dismiss, or in the alternative, for summary judgment. After extensive briefing, the Court heard oral argument.[5] The Court now writes to explain its rulings.

---

2. (Def.'s Mot. to Dismiss and, in the Alternative, for Summ. J., Decl. of Denise Gottleib, Ex. B Mem. from Kathleen Sawyer, Federal Bureau of Prisons to Federal Judges 12/20/2002).

3. It is likely that both Kiley and Haspert would have served their sentences at a CCC under the old practice.

4. Haspert raised the same objections to the new practice as had Kiley.

5. The Court commends Counsel for the high quality of their briefs and oral arguments.

## II. ANALYSIS

### A. Constitutional Claims

Kiley and Haspert argue that the new practice violates the Equal Protection Clause, the Due Process Clause, and the Ex Post Facto Clause. As explained herein, none of these clauses entitle Plaintiffs to relief.

### 1. Equal Protection

■ The new practice does not draw a suspect classification or infringe upon a fundamental constitutional right. Accordingly, it is subject to a highly deferential "rational-basis" review. *F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993).[6] Plaintiffs do not argue that the new practice itself is irrational; nor could they. A reasonable person could well conclude that a defendant who is only confined for part of each day is not imprisoned.

Kiley and Haspert do contend, however, that the BOP's rules for implementing the new practice are arbitrary and unreasonable. For example, Plaintiffs question the rationality of a system that designates a defendant to a CCC or to a traditional prison based solely on whether the designation took place before or after December 20, 2002. Plaintiffs also contend that it is arbitrary to re-designate an inmate of a CCC who has 151 days remaining on his term, while allowing another inmate with 149 days remaining to stay in the CCC.

This argument fails. By definition, time limits produce arbitrary results.[7] Nonetheless, they are useful and often indispensable administrative tools. The BOP quite reasonably set a timetable for implementing the new practice. Because neither the new practice nor its implementation run afoul of the Equal Protection Clause, the Court will GRANT the BOP's motion for summary judgment as to Count Five of the Amended Complaint.

### 2. Due Process

■ In the prison administration context, a governmental entity "may under certain circumstances create liberty interests which are protected by the Due Process Clause." *Sandin v. Conner*, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). Protectable liberty interests, in this setting, are "generally limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.*

■ Kiley and Haspert argue that Congress created a liberty interest by vesting the BOP with discretion to place offenders in a CCC. The BOP violated this interest by refusing to consider Kiley or Haspert for this designation, Plaintiffs contend.

This argument falls short. Kiley and Haspert are aggrieved by the new practice because it would place them in a traditional prison, rather than a CCC. Because the hardships endured in a traditional prison are, by definition, typical of prison life, Plaintiffs' Due Process claim fails. Accordingly, the Court will GRANT the BOP's motion for summary judgment as to Count Six of the Amended Complaint.

---

6. Under this standard, the new practice "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Beach Communications, Inc.*, 508 U.S. at 313, 113 S.Ct. 2096.

7. For example, a suit filed one day after the applicable statute of limitations has run will be barred, but an identical suit filed two days earlier may proceed.

### 3. Ex Post Facto

■ Because the OLC Memorandum is an interpretive rule,[8] the Ex Post Facto Clause is inapplicable. *United States v. Ellen*, 961 F.2d 462, 465 (4th Cir.1992). Accordingly, the Court will GRANT the BOP's motion for summary judgment as to Count Four of the Amended Complaint.

### B. *Notice and Comment Under the APA*

The BOP announced the new practice without prior notice and without giving the public an opportunity to comment. Under the APA, an administrative agency must provide notice and comment before promulgating a legislative rule. 5 U.S.C. § 553(b), (c). An agency may, however, adopt straightaway rules of procedure or rules that merely interpret pre-existing statutes or regulations. *Id.* § 553(b).[9]

It is clear that the new practice is not a procedural rule. A procedural rule is one that "alter[s] the manner in which the parties present themselves or their viewpoints to the agency." *RSM, Inc. v. Buckles*, 254 F.3d 61, 68 (4th Cir.2001) (alteration in original) (quoting *JEM Broadcasting Co. v. F.C.C.*, 22 F.3d 320, 326 (D.C.Cir.1994)). The new practice is not a procedural rule because it does not affect how prisoners present their requests to the BOP.

■ Differentiating between legislative[10] and interpretive[11] rules can be a difficult task. The BOP's new practice fits the definition of an interpretive rule because it does not purport to create new law. Instead, the OLC Memorandum draws upon pre-existing statutes, case law, and sentencing guidelines in reaching its conclusion. The Memorandum, therefore, merely interprets pre-existing law. Accordingly, the BOP practice is an interpretive rule and is exempt from notice and comment. The Court, therefore, will GRANT the BOP's motion for summary judgment as to Count One of the Amended Complaint.[12]

### C. *Validity of the BOP's Interpretation*

Kiley and Haspert argue that the new practice contradicts the law it purports to interpret. *See* 5 U.S.C. § 706(2)(A). The BOP contends that the OLC Memorandum correctly interprets governing law, and that the Court should defer to its reasoning.

---

8. *See infra* Part II.B.

9. The parties agree that the new practice constitutes a "rule." Kiley and Haspert contend that the new practice is a legislative rule that must be struck down for lack of notice and comment. The BOP rejoins that the practice is either a rule of agency procedure or an interpretive rule.

10. Legislative rules "grant rights, impose obligations, or produce other significant effects on private interests ... or ... effect a change in existing law or policy." *Am. Hosp. Assoc. v. Bowen*, 834 F.2d 1037, 1045 (D.C.Cir.1987) (citations and internal quotations omitted).

11. "[I]nterpretive rules simply state what the administrative agency thinks the statute means, and only 'remind' affected parties of existing duties." *Jerri's Ceramic Arts, Inc. v. Consumer Product, Safety Comm'n*, 874 F.2d 205, 207 (4th Cir.1989).

12. Plaintiffs argue alternatively that if the practice constitutes an interpretive rule, it changes a long-standing agency interpretation and, therefore, must be accompanied by notice and comment. The Court disagrees. It is correct to say that an agency may change its interpretation of its own regulations only after notice and comment. *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C.Cir.1997). An agency may, however, alter its interpretation of a statute, as the BOP did here, without notice and comment. *Id.*

■ An agency's rules are entitled to a level of deference measured under one of two standards. Generally, heightened *Chevron*[13] deference is reserved for the legislative rules that an agency issues within the ambit of the authority entrusted to it by Congress. *United States v. Mead Corp.*, 533 U.S. 218, 227, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). Such rules are characteristically promulgated only after notice and comment. *Id.* Lesser *Skidmore*[14] deference is generally applied to interpretive rules, which, although entitled to respect, will be upheld only if persuasive. *Mead*, 533 U.S. at 232, 121 S.Ct. 2164; *see also Cunningham v. Scibana*, 259 F.3d 303, 306–07 (4th Cir.2001).

■ The new practice does not purport to carry the force of law, and was not adopted after notice and comment. It, therefore, is afforded only limited *Skidmore* deference.

■ The OLC Memorandum explains the reasoning behind the BOP's change in practice. It argues that time spent in a CCC does not qualify as a term of imprisonment because:

(i) the Sentencing Guidelines draw a distinction between community confinement and "a sentence of imprisonment;"

■ case law interpreting the Guidelines draws this same distinction;

(iii) the language of 18 U.S.C. § 3621(b) does not give the BOP explicit authority to designate to a CCC a person sentenced to a term of imprisonment;

(iv) reading unfettered authority into § 3621(b) renders 18 U.S.C. § 3624(c) superfluous. The latter section authorizes the BOP to transfer prisoners nearing the end of their sentence to "home detention" or community confinement as part of their readjustment to society; and

(v) a CCC is not a "place of ... imprisonment" within the ordinary meaning of that phrase.

While the OLC's position is plausible, its reasoning is ultimately unpersuasive. First, the Memorandum fails to find support in the legislative history of the enabling statute itself. Prior to 1987, the Attorney General had statutory authority to designate the place of a convict's imprisonment. 18 U.S.C. § 4082(a) (1982). The enabling legislation expressly stated that persons serving a term of imprisonment could be designated to a "residential community treatment center." *Id.* § 4082(f) (1982). Pursuant to this authority, the Attorney General regularly designated prisoners to CCCs.

On November 1, 1987, Congress transferred designation authority from the Attorney General to the BOP. Pub.L. 98–473, Title II, § 212(a)(2); 98 Stat. 2007. The revised statute did not explicitly mention community confinement as a place where a prisoner could serve his term of imprisonment. This omission, however, did not mean that the BOP inherited less discretion than the Attorney General. To the contrary, the legislative history explicitly states that the BOP would enjoy the same authority as its predecessor. *See* 1984 U.S.C.C.A.N. 3182, 3324; *Barden v. Keohane*, 921 F.2d 476, 481 (3d Cir.1990) (noting that the amendment "was not intended to change pre-existing law with respect to the authority of the Bureau").

---

13. *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

14. *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944).

From 1987 until 2002, the BOP continued the Attorney General's practice of designating prisoners to CCCs. It was only in December of 2002 that the OLC posited that a CCC does not qualify as imprisonment and that its long-standing practice was, therefore, illegal.

Second, the plain language of the current statute grants the BOP plenary authority to designate a defendant to the most appropriate facility within its inventory. Section 3621(b) states: "The Bureau of Prisons shall designate the place of the prisoner's imprisonment. The Bureau may designate any available penal or correctional facility." Nothing in this language suggests that Congress intended to foreclose the option of designating prisoners to CCCs in appropriate cases.

Third, related statutes equate community confinement with imprisonment even though the inmate is not under lock and key all day. 18 U.S.C. § 3622 provides that the BOP "may release a prisoner from the place of his imprisonment for a limited period" to "work at paid employment in the community while continuing in official detention at the penal or correctional facility." 18 U.S.C. § 3622(c). Thus, a person may work in the community (as do some convicts designated to a CCC), and, nevertheless, be in official detention at a penal or correctional facility.

18 U.S.C. § 3624(c) directs the BOP to assure that a prisoner serves the last few months of his "term of imprisonment" "under conditions that will afford the prisoner a reasonable opportunity to adjust to ... the prisoner's re-entry into the community." The statute explicitly provides that this portion of the "term of imprisonment" may be served "in home confinement." *Id.* Congress, therefore, expressly equated home confinement (which is less restrictive than a CCC) with imprisonment.[15]

Fourth, the Supreme Court in *Reno v. Koray,* 515 U.S. 50, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995) reasoned that a defendant detained in a CCC while awaiting trial would be in "official detention" so long as the defendant is in the custody of the Attorney General. *Id.* at 62–63, 115 S.Ct. 2021. Time served by the detainee under these conditions should be credited towards any eventual term of imprisonment, the Court stated.[16] *Id.*

Based on this reasoning, a defendant designated to a CCC post-conviction is also in official detention in the custody of the Attorney General. 18 U.S.C. § 3621(a). Time spent by such a defendant would, therefore, count towards the service of his term of imprisonment.

The OLC Memorandum correctly states that § 5C1.1 of the Sentencing Guidelines differentiates between imprisonment and community confinement. This provision cannot be squared with relevant statutes, however. Because statutes trump the Guidelines, *United States v. LaBonte,* 520 U.S. 751, 757, 117 S.Ct. 1673, 137 L.Ed.2d 1001 (1997), § 5C1.1 is not controlling.

**15.** Reading § 3621(b) as authorizing the BOP to designate a prisoner to a CCC at the outset of his term would render § 3624(c) superfluous, the BOP contends. The Court disagrees. Section 3621(b) grants the BOP the discretion to designate prisoners to a CCC at the outset of their terms, while § 3624(c) mandates that the BOP move prisoners to a CCC or home confinement near the end of their terms.

This is precisely the construction given to §§ 3621(b) and 3624(c) by the BOP as recently as 1998. (Def.'s Mot. to Dismiss and, in the Alternative, for Summ. J., Decl. of Linda Moore, Ex. B., BOP Program Statement 7310.04 of 12/16/1998 at 4.)

**16.** Federal pretrial detainees are not always in the custody of the Attorney General.

#### D. BOP's Action as an Exercise of Discretion

At oral argument, the government disavowed the OLC Memorandum.[17] Government counsel invited the Court to disregard the Memorandum and analyze the case as if the BOP had merely exercised its discretion to designate Kiley and Haspert (and all others serving a sentence of imprisonment) to a traditional prison.[18]

The Court must decline this invitation. The OLC Memorandum cannot be disregarded as irrelevant.[19] Former Director Sawyer specifically stated that the BOP was changing its longstanding practice in conformity with the mandate from the OLC.[20]

Thus, the existence of discretion cannot cure the error of law. An analogy to the sentencing context is helpful. If the judge recognizes that he has the power to depart but declines to do so, his decision is virtually unreviewable. If, however, the judge mistakenly concludes that he lacks the power to depart, then the case will be remanded for resentencing. *Iacaboni*, 251 F.Supp.2d at 1038.

Here, the BOP mistakenly concluded that it lacked the discretion to designate Kiley or Haspert to a CCC. The designations of Kiley and Haspert must be revisited under the correct standard.

Accordingly, the Court finds that the BOP's interpretive rule contradicts preexisting law. The Court will DENY the BOP's motion for summary judgment as to Count Two of the Amended Complaint.

#### E. Remedy

The Court holds that the new practice is based on an erroneous interpretation of governing law and, therefore, cannot stand.[21] Accordingly, the Court will OR-

---

17. The government's counsel characterized the Memorandum as a "verbal blunder."

18. The BOP is not required to consider every facility in its inventory when designating a convict. In the exercise of its discretion, the BOP may objectively classify both convicts and institutions. For example, the BOP might legitimately decide that all defendants convicted of a crime of violence are ineligible for a minimum security prison. The BOP may reserve its medically intensive prisons for inmates suffering from certain ailments.

19. The BOP's change in practice was not a mere "policy statement." The distinction between a policy statement and a substantive rule "turns on an agency's intention to bind itself to a particular legal policy position." *U.S. Telephone Ass'n v. F.C.C.*, 28 F.3d 1232, 1234 (D.C.Cir.1994). It is clear that the BOP changed course because it believed that its prior practice violated binding law.

20. "[A]n agency's action may not be upheld on grounds other than those relied upon by the agency." *Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407, 420, 112 S.Ct. 1394, 118 L.Ed.2d 52 (1992) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 88, 63 S.Ct. 454, 87 L.Ed. 626 (1943)).

21. Even if the new practice were valid, it would be impermissibly retroactive as applied to Kiley. An agency may not promulgate a retroactive rule absent express Congressional authority. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). "A statute has retroactive effect when it [among other things] '... attaches a new disability, in respect to transactions or considerations already past.'" *I.N.S. v. St. Cyr*, 533 U.S. 289, 321, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (quoting *Landgraf v. USI Film Products*, 511 U.S. 244, 270, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)).

In *St. Cyr*, the Supreme Court considered a statutory amendment that removed the Attorney General's discretion to allow aliens convicted of a crime to remain in this country. The Court found the amendment to be impermissibly retroactive as applied to aliens who had pleaded guilty prior to the amendment.

This Court finds *St. Cyr* controlling as to Kiley. When Kiley pled guilty, the BOP's practice was to consider designating certain nonviolent offenders with short sentences to a

DER the BOP to revisit the designations of Kiley and Haspert using the pre-December 2002 discretionary standard. No court has the authority to order the BOP to designate Kiley or Haspert to any specific facility. The BOP is not, therefore, precluded from sending them to a traditional prison. Nevertheless, if the BOP still chooses to designate Kiley and Haspert to traditional prisons, the BOP will bear the burden of demonstrating that it applied the discretionary standard in making this decision.

The Court will schedule a hearing to address further proceedings.

## III. *CONCLUSION*

For the reasons stated herein, the Court will, by separate Order filed this date, DENY IN PART and GRANT IN PART the government's pending motion for summary judgment.

### *ORDER*

For the reasons stated in the Memorandum of even date, the Court hereby:

(i) GRANTS the BOP's motion for summary judgment as to Count One (notice and comment), Count Three (Retroactivity) as it applies to Haspert, Count Four (Ex Post Facto), Count Five (Equal Protection), and Count Six (Due Process) of the Amended Complaint;

(ii) DENIES the BOP's motion for summary judgment as to Count Two (not in accordance with governing law), and Count Three (retroactivity)

CCC. The new practice, therefore, is impermissibly retroactive as applied to him. Accordingly, the Court will DENY the BOP's motion for summary judgment as to Count Three as it applies to Kiley.

By contrast, however, Haspert pleaded guilty only after the BOP had announced the

as it applies to Kiley, of the Amended Complaint; and

(iii) ORDERS the BOP to REVISIT the designations of Kiley and Haspert using the pre-December 2002 discretionary standard.

new practice. The practice, therefore, has no impermissible retroactive effect on her. Accordingly, the Court will GRANT the BOP's motion for summary judgment as to Count Three as it applies to Haspert.